**Mark LAURETANO, Plaintiff,**

v.

**Arthur SPADA, John Bardelli, Edmund C. Brunt, Timothy F. Barry, Frank Maco, and the State of Connecticut, Defendants.**

**No. 3:99CV1077 (DJS).**

United States District Court, D. Connecticut.

Sept. 30, 2004.

---

Karen Lee Torre, New Haven, CT, for Plaintiff.

Gregory T. D'Auria, Jane B. Emons, Terrance M. O'Neill, Thomas J. Davis, Jr., Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION

SQUATRITO, District Judge.

Plaintiff Mark Lauretano, a trooper in the Connecticut Department of Public Safety, State Police Division ("State Police" or "CSP"), brings this action pursuant to 42 U.S.C. § 1983 against the State of Connecticut; Arthur Spada,[1] Commissioner of Public Safety; Retired Colonel John Bardelli of the CSP; Lieutenant Edmund Brunt of the CSP; and Colonel Timothy Barry of the CSP.[2] Lauretano claims that his superiors within the CSP violated his rights under the Free Speech Clause of the First Amendment to the U.S. Constitution by preventing him, through a written policy and verbal commands, from speaking out as a citizen regarding matters of public concern and by retaliating against him for seeking to exercise these rights. Lauretano seeks an injunction preventing enforcement of the CSP media policy and a preliminary injunction negating verbal directives allegedly prohibiting him from exercising his rights under the First Amendment. Defendants deny liability in all respects and, in their respective individual capacities, assert the defense of qualified immunity to Lauretano's claims for damages. This memorandum of decision sets forth the court's decision regarding Lauretano's claims for (1) permanent and (2) preliminary injunctive relief and (3) defendants' motion for summary judgment.

### I.

This lawsuit concerns the CSP's investigation of allegations of sexual assault upon a minor boy at the Hotchkiss School in Salisbury, Connecticut. The original investigation also led to two internal affairs investigations. One of these internal affairs investigations concerned Lauretano's conduct during the course of the sexual assault investigation, for which he received a sixty-day suspension. The entire CSP investigation received a significant amount of local news coverage during the period between December of 1997 through June of 1999. Lauretano claims that the CSP, through its written policies and oral directives, improperly impinged upon his right to speak as a citizen regarding the investigation.

Lauretano is a CSP Trooper. Defendant Arthur Spada is the current Commissioner of Public Safety. Defendant John Bardelli was a CSP colonel and served as the Deputy Commissioner of Public Safety until his retirement. As colonel, Bardelli was the commanding officer of the CSP until his retirement. Defendant Timothy Barry served as a lieutenant colonel in the CSP and reported directly to Bardelli during the part of Bardelli's tenure relevant to the events in this lawsuit. Upon Bardelli's retirement, Barry became the Deputy Commissioner of Public Safety, and now holds the rank of colonel. Edmund Brunt, during the relevant time period, was a lieutenant in the CSP, and was the Commanding Officer of the CSP Professional Standards Unit.

### II.

Lauretano initiated this lawsuit on June 8, 1999. His complaint now alleges the following causes of action: (1) unconstitutional suppression of speech; (2) unconstitutional prior restraint on speech; (3) dis-

---

1. Lauretano originally named Henry Lee as a defendant, but Lee no longer holds the position of Commissioner of Public Safety. Spada, who replaced Lee as Commissioner of Public Safety, was substituted as a party on December 18, 2001.

2. Frank Maco, State's Attorney for the Judicial District of Litchfield, was originally named a defendant and was dismissed on November 2, 2000.

criminatory content-based application of the CSP media and employee speech regulations; (4) retaliation for engaging in protected activity; (5) retaliation designed to chill the exercise of constitutional rights; (6) retaliation for protected association; (7) conspiracy to violate constitutional rights in violation of 42 U.S.C. § 1985; and (8) conspiracy to retaliate in violation of 42 U.S.C. § 1985.[3] In addition to his complaint, Lauretano filed a motion for a preliminary injunction, which was denied as moot on March 10, 2000.

After a period of discovery in this matter, the parties engaged in extensive settlement negotiations before the Honorable William I. Garfinkel, United States Magistrate Judge, between June 20, 2001 and October of 2002. In anticipation of these discussions, the court denied defendants' motion for summary judgment without prejudice on August 30, 2001. Despite extensive negotiation, this matter did not settle.[4]

When the parties were unable to reach a mutually satisfactory resolution, they revived the previous disputes. Lauretano re-filed his motion for a preliminary injunction on December 10, 2001, and requested a hearing on this motion at an October 23, 2002 status conference. Defendants re-filed their motion for summary judgment on November 15, 2002. A hearing on Lauretano's request for injunctive relief was held on November 19 and 26, 2002; December 6, 2002; January 29–31, 2003; and February 10–11 and 19, 2003. During the course of the hearing, the court partially converted Lauretano's request for a preliminary injunction into a hearing on a permanent injunction regarding all matters properly reserved to the court for decision.

## III.

The nature of Lauretano's claims, as they have evolved through the proceedings before the court, requires further articulation. Lauretano's causes of action can be grouped into four categories. First, Lauretano challenges the validity of certain provisions in the Fourth Edition of the State of Connecticut Department of Public Safety A & O Manual (hereinafter "media policy") under the First Amendment. Second, Lauretano challenges the validity of certain oral directives from his supervisors under the First Amendment. Third, Lauretano claims that the CSP took and conspired to take adverse employment actions against him in retaliation for criticizing the conduct of other officers, in an effort to chill his right to speak, and in violation of his right to associate with CSP Trooper Kathleen Lauretano, who also happens to be his wife. Fourth, Lauretano alleges that the CSP selectively enforced its media policy in violation of the Equal Protection Clause of the Fourteenth Amendment.

As to the first category, Lauretano principally seeks injunctive relief. Because the first category of claims involves legal issues to be resolved by the court, this category of claims is properly tried to the court. To the extent Lauretano asserts these claims in his motion for a preliminary injunction, the motion is converted into a motion for a permanent injunction, which has been tried to the court. *See* Fed.R.Civ.P. 65(a)(2).

---

**3.** The court dismissed Lauretano's claims based upon state law on September 1, 1999.

**4.** To the extent either party mentioned the substance of settlement negotiations during the course of proceedings before the court, these representations have not been taken into account in rendering a decision on the matters before the court.

## A. MOTION FOR A PERMANENT INJUNCTION

### 1. Standard

Lauretano's claims addressed to the CSP media policy are subject to the balancing test announced by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *United States v. National Treasury Employees Union,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*").[5] When it acts as an employer, "the government may impose restraints on the First Amendment activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large." *Melzer v. Board of Education of City School Dist. of City of New York,* 336 F.3d 185, 192 (2d Cir.2003). In *Pickering,* the Supreme Court struck a balance between the right of the employee to speak and the employer's interest in effectively conducting its affairs:

> The *Pickering* test involves a two-step inquiry: first, a court must determine whether the speech which led to an employee's discipline relates to a matter of public concern; and, second, if so, the balance between free speech concerns is weighed against efficient public service to ascertain to which the scale tips.

*Melzer,* 336 F.3d at 193. When the employee challenges an official policy that applies to all employees of the governmental entity, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 513 U.S. at 468, 115 S.Ct. 1003 (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731).

### 2. Findings of Fact

1. Lauretano was and remains a sworn member of the Connecticut State Police (hereinafter "CSP"). He has been a State Trooper for nearly twenty years and for a period of ten years was assigned as the Resident Trooper in the Town of Salisbury, Connecticut.

2. Lauretano attended a wide variety of professional training courses throughout his career, including training in interviewing, interrogation, and sexual assault investigation. With respect to sexual assault investigations, Lauretano completed the current "Connecticut Police Response to Crimes of Sexual Assault" course produced by the Connecticut Sexual Assault Crisis Services Inc.

3. As a Resident Trooper, Lauretano handled many child sexual assault cases. The specialized training led him to communicate his recommendation to the commanding officer at the CSP training acade-

---

5. In *NTEU,* the Supreme Court effectively eschewed traditional First Amendment jurisprudence terms of art in favor of a modified version of the *Pickering* balancing test, which is to be applied when an employee challenges the validity of a generally applicable policy restricting employee speech. This analysis has been termed "an as applied challenge to a broad category of non-official employee speech." *Sanjour v. EPA,* 56 F.3d 85, 93 (D.C.Cir.1995) (en banc) (quotation marks omitted). To the extent Lauretano asserts facial, as applied, or overbreadth challenges to the CSP policy, or relies upon the Supreme Court's prior restraint doctrine, these claims merge into the *Pickering/NTEU* analysis. *See Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir.1998) ("[U]nder the Pickering/NTEU test the distinction between facial and as-applied constitutional challenges becomes unimportant."); *Weaver v. United States Information Agency,* 87 F.3d 1429, 1440 (D.C.Cir.1996) (holding that the special concerns implicated by prior restraints on speech can be accounted for in the *Pickering* analysis); *Sanjour,* 56 F.3d at 92 & n. 10.

my that such training be made available to all Resident Troopers.

4. Lauretano believes that troopers may not make any comment of any kind to the media. A trooper may not even release a simple detail about a motor vehicle accident unless it is initialed by a supervisor.

5. Apart from the dispute which led to the instant case, Lauretano recalls a prior incident where he was criticized for making comments to the media. Lauretano had given some statistical information to the media indicating that the burglary rate in his geographical area had been substantially reduced. Lieutenant Watrous, Lauretano's supervisor at the time, asked Lauretano if he thought he was a "fucking rogue cop out there on his own?" (Tr. 330:2–4). Sergeant Logan, also a superior officer to Lauretano, further indicated to Lauretano that the "media is a bunch of whores" and that Lauretano was not to speak to the media "ever." (Tr. 330:7–10).

6. Defendant Ret. Colonel John Bardelli served as a colonel and the commanding officer of the CSP from January 15, 1998 until his retirement in July of 2001.

7. Defendant Colonel Timothy Barry is currently the commanding officer of the CSP and holds the title of Deputy Commissioner of Public Safety.

8. During the first week of September, 1997, Lauretano became responsible for investigating an allegation by a fourteen year-old student that he had been sexually assaulted by two fellow male students in February of 1997. All were boarding students at the Hotchkiss School, a private boarding school located in Lakeville, Connecticut. The matter was assigned a case number and characterized as an incident involving an assault in the first degree.

The case was assigned to Lauretano in accordance with normal procedure and practice.[6]

9. At the time, Lauretano was the Resident Trooper of the Town of Salisbury, which is under the jurisdiction of CSP Troop B, which is headquartered in New Canaan. Pursuant to his position, Lauretano was the ranking law enforcement officer in the town, but he remained assigned to Troop B, where he reported to his superiors.

10. Lauretano commenced an investigation into the matter, which included interviews of approximately fifteen students and faculty members, interviews of the two accused boys and various witnesses to related pertinent events.

11. Lauretano, in response to a request from the State's Attorney's Office to re-interview the complainant, employed a specialist in sexual assault victim interviewing and evaluation, Kym Crown, L.C.S.W., to conduct the re-interview. Crown's interview of the complainant was videotaped, and she rendered a report thereafter.

12. The alleged victim was not from a wealthy family and was attending the Hotchkiss School on a merit scholarship funded by a New York organization. The boy's mother (hereinafter "Ms. M") was not of financial means.

13. Lauretano did not seek Crown's $300.00 fee from the CSP. Lauretano and his wife, CSP Trooper Kathleen Lauretano, discussed the fee, and Mrs. Lauretano indicated that she would pay the fee. Mrs. Lauretano delivered the $300.00 to Lauretano's office, purportedly as an anonymous donation. Lauretano then retained Crown to conduct the interview.

---

6. From this point on, the court will refer to the CSP's investigation into the possible sexu-

al assault at the Hotchkiss School as "the Hotchkiss investigation or case."

14. On November 4, 1997, Crown wrote a letter to Lauretano enclosing her final report and refunding $100.00 of her fee.[7]

15. Lauretano prepared an application for a search warrant for the purpose of gaining access to certain school records. Lauretano had received information from individuals at the school to the effect that one or both of the accused boys had previously been in disciplinary trouble and that both had been known to harass the complainant on the basis of his race. The application contained details of Lauretano's ongoing investigation.

16. The application was presented to the Connecticut Superior Court and granted by the Honorable Michael Sheldon, who found probable cause for the search and seizure. Judge Sheldon indicated that he could initially seal the search warrant for two weeks only and that Lauretano should advise the State's Attorney to reapply for a continued sealing of the records at the end of the two-week period.

17. Lauretano and Trooper David Beare, a co-affiant on the application, immediately informed Assistant State's Attorney David Shepack of Judge Sheldon's advisement. Mr. Shepack works under the supervision of State's Attorney Frank Maco, who was in charge of the State's Attorney's Office in Litchfield. Lauretano followed up on the matter with several telephone calls to Mr. Maco's office and a memorandum to the State's Attorney's Office on November 18, 1997.

18. By the same memorandum of November 18, 1997, Lauretano transmitted a new version of an arrest warrant application for the two alleged perpetrators. Lauretano also requested a meeting with Shepack for the purpose of addressing any questions or problems the State's Attorney had with Lauretano's previous submissions.

19. Lauretano sent Inspector Ronald DeNuzzo, who worked for the State's Attorney's Office, the videotape of Crown's interview of the complainant. Lauretano had been in contact with DeNuzzo regarding his investigation.

20. The story about the accusation at Hotchkiss apparently broke to the public on or about December 6, 1997. Between December 6, 1997 and January 16, 1998, several published articles discussed the allegations in a general fashion, and noted that the Hotchkiss School, the CSP, and the State's Attorney's Office were investigating the allegations. Primarily, the articles reiterated the information learned about the allegations and noted that the school, the CSP and the State's Attorney's Office declined to comment about the specifics of the investigation.

21. The State's Attorney's Office did not move to re-seal the search warrant, and the details set forth therein were published by the *Waterbury Republican–American* on January 16, 1998. This article contained statements from Ms. M regarding her son's behavior and the status of the CSP investigation.

22. After discussions and the exchange of written correspondence with DeNuzzo, who works under Maco's direction, Lauretano prepared a final draft of the arrest warrant affidavits. He was reporting at the time to Lieutenant Benjamin Pagoni of the CSP, who was the commanding officer at Troop B. On January 13, 1998, Pagoni also ordered Lauretano to prepare a memo responding to DeNuzzo's criticisms of previous drafts of the application. Lauretano intended to go to Maco's office to present the final drafts of the warrants.

---

7. Lauretano maintains that Mrs. Lauretano, after unsuccessfully attempting to convince Crown to accept the full original fee, placed the refund in a church collection basket.

23. Lauretano believed that Maco returned the warrant drafts to him because Maco was "fence sitting." (Tr. 205:6). Lauretano expressed the following beliefs about why Maco had not yet prosecuted the case:

> I think that the case was a hot potato, that there were racial implications in the case. The mother, the boy being black, the two accusers, the two accused being white, upper-class, at the school. And then I felt he didn't want to make a decision, that he specifically took that case away from me to give it to the major crime officers, minus telling them there was a videotape interview, answering all of his questions and sending them back out to re-interview the boy for four hours, that any expert in the field will tell you will cause a recant, will possibly cause a recantation or a victim to recant what happened or just let the case go away.

(Tr. 206:16–207:2).

24. Before Lauretano was going to go to Maco's office to discuss the arrest warrant drafts, during the last week of January in 1998, Pagoni advised Lauretano that the investigation was transferred to the CSP's Western District Major Crimes unit ("WDMC").

25. Lauretano was "upset" at being removed from the case because he "felt that [the case] was being given to a junior investigator within the department" with less experience than Lauretano. (Tr. 72:9,16–17, & 25).

26. According to Lauretano, Hyatt stated that Maco had instructed the WDMC to start the investigation from the beginning, including re-interviewing the complainant. (*See* Tr. 208:3). Hyatt also indicated that Maco had referred to a prior case he prosecuted against Woody Allen, which had reflected poorly upon Maco. (Tr. 2072:1–208:3). Lauretano wished to express an opinion as to Maco's actions.

27. During the month of January, 1998 Pagoni told Lauretano "not to speak to the press." (Tr. 61:9–10). Specifically, Lauretano stated that Pagoni "called me into his office and told me that he couldn't—he couldn't save my ass if I spoke to the press." (Tr. 125:12–14). Further, Pagoni stated that "[i]f you speak to the press, they're going to find something and they're going to come after you." (Tr. 126:20–21).

28. Pagoni's statements followed closely after Lauretano had responded to a reporter's inquiry to him regarding the identity of the source of information reported in another newspaper. Lauretano responded by stating that the information "could only have come from one of two places, came from my office or Frank Maco's and it didn't come from mine...." (Tr. 126:12–14). Pagoni had spoken to Maco about the reporter's inquiry, and, after Maco's call, Pagoni called Lauretano into his office and made the aforementioned statements to Lauretano.

29. Following the initial unsealing of the arrest warrant, several news articles discussed Ms. M's dispute with the Hotchkiss School regarding her son's return to the school and the transfer of the investigation to the WDMC.

30. On March 2, 1998 Sgt. Hyatt of the WDMC advised Lauretano that the complainant was to be interviewed again.

31. Hyatt asked Lauretano to personally call Ms. M to get her consent for a meeting between the boy and the new investigators. Hyatt stated that the purpose of the meeting was a "get-acquainted meeting, that [WDMC] investigators hadn't met the boy or the mother, and that prior to submitting any warrants, they wanted to at least be able to say that they

met [the boy and his mother]." (Tr. 77:1–4). Lauretano complied and the mother agreed to have her son meet the investigators. Lauretano was not present at the meeting, which took place on February 28, 1998.

32. Lauretano believes that the decision to interview the complainant and the interview itself were improper. Regarding the former, Lauretano believes that the complainant had been interviewed too many times: "I felt that it was detrimental to the boy because of his emotional state. I had already interviewed him, and felt every time we try to broach the subject of the actual assault, he would completely break down." (Tr. 64:15–18).

33. Regarding the interview itself, Lauretano believes that Ms. M should have been present during the interview, that the interview was too lengthy, and that the interview should have been recorded.

34. With respect to the interview, Lauretano stated the following:

> [T]hrough any training and experience over the years, most of these classes, people who specialize in this area, feel that it needs to be a non-intimidating type environment when you're dealing with the emotional stress around an act like this. This was a sodomy. It was a difficult situation for the boy. He's a juvenile. And he probably needed the support of his mother, in my opinion. (Tr. 87:1–8).

35. Lauretano believes that, pursuant to Section 17a–101h of the Connecticut General Statutes,[8] the CSP does not have the right to deny a minor's request to have a parent present during an interview. (*See* Tr. 88:1–6).

36. Lauretano also believes that the WDMC's actions were contrary to Section 17a–101h, which, according to Lauretano, requires investigators "to share information regarding the interviewing and different types of, different child abuse cases. In other words, share all of that information prior to any re-interviews." (Tr. 85:21–25). Lauretano believes that the WDMC investigators had not reviewed the tape of the Crown interview prior to interviewing the complainant on February 28, 1998.

37. Lauretano believes that "it would certainly clear up any problems regarding public concern if there were tape recordings of interviews." (Tr. 135:22–24).

38. Following this interview, the complainant provided a written statement recanting his prior accusations.

39. Ms. M called Lauretano to express her anger over the conduct of the WDMC officers.

---

8. Section 17a–101h of the Connecticut General Statutes provides the following:

Notwithstanding any provision of the general statutes to the contrary, any person authorized to conduct an investigation of abuse or neglect shall coordinate investigatory activities in order to minimize the number of interviews of any child and share information with other persons authorized to conduct an investigation of child abuse or neglect, as appropriate. The commissioner shall obtain the consent of parents or guardians or other persons responsible for the care of the child to any interview with a child, except that such consent shall not be required when the department has reason to believe such parent or guardian or other person responsible for the care of the child or member of the child's household is the perpetrator of the alleged abuse. If consent is not required to conduct the interview, such interview shall be conducted in the presence of a disinterested adult unless immediate access to the child is necessary to protect the child from imminent risk of physical harm and a disinterested adult is not available after reasonable search.

Conn. Gen.Stat. § 17a–101h.

40. On March 2, 1998, Lauretano met with Hyatt and Pagoni to discuss the events of February 28, 1998. Lauretano criticized Hyatt and the other WDMC officers at this meeting.

41. On March 3, 1998, the *Republican–American* reported that Ms. M accused the WDMC of pressuring her son to recant his accusations. The article quoted the complainant's statement to the WDMC. The article states that Hyatt declined comment to the reporter.

42. A March 5, 1998 *Lakeville Journal* article discussed Ms. M's account of the WDMC's conduct in detail, including commentary critical of the WDMC's conduct.

43. On March 6, 1998, Lauretano prepared a continuation of investigation report, in which he set forth the details of his conversations with the complainant and his mother on February 28 and March 1, 1998.

44. On April 5, 1998, the *Republican–American* published two articles concerning the Hotchkiss investigation. One article stated that Maco and former Commissioner of Public Safety John Connelly denied that the WDMC violated the complainant's rights. This article discussed the CSP policy of interviewing minor accusers outside the presence of their parents within the context of the WDMC's interview of the complainant. In the second article, Maco stated that there was no arrest warrant pending for his review, and that he had reviewed drafts of arrest warrant applications and had returned them to Lauretano because Maco had some concerns. Maco also stated that he was not involved in the decision to transfer the investigation to the WDMC.

45. Also on April 5, 1998, the *Republican–American* published an article by Donald Connery criticizing the CSP for its handling of the complainant's interview and asserting that the interview violated CSP policy.

46. On or April 23, 1998, Ms. M filed a complaint about the interview with the Department of Public Safety in the form of a letter to John Connelly.[9] Connelly referred the investigation to Bardelli, who initiated an IA investigation into the conduct of Hyatt, Detective Wesley Clark, and Trooper James Lynch.

47. On May 13, 1998, Connery wrote a letter to Bailey, Connelly, and Bardelli questioning the manner in which the Hotchkiss case was investigated and asking certain questions regarding his perceived problems with the CSP's conduct.

48. On May 15, 1998, the *Litchfield County Times* published a piece advocating the use of video recording devices for police interrogations and citing the Hotchkiss investigation as a case where this practice would have benefited the public.

49. Lieutenant Edmund Brunt, a member of the CSP Professional Standards Unit (hereinafter "IA" or "internal affairs") was assigned to investigate Ms. M's charge of misconduct. Sergeant Robert Corona assisted Brunt in this regard.

50. Brunt and Corona interviewed the complainant on August 15, 1998, and the complainant stated that the stress he was feeling at the time may have caused him to have a vivid dream that he was sexually assaulted, and that he believes that the incident never happened. He confirmed that the written statement he provided on February 28, 1998 was accurate.

---

9. Apparently, between April and June of 1998, the investigatory file was transferred from Maco to Chief State's Attorney John Bailey for his review, and then back to Maco from Bailey. The apparent purpose for Bailey's review was to determine whether Maco had a conflict of interest.

51. Brunt and Corona interviewed Lauretano on August 27, 1998. Brunt stated that he was interviewing Lauretano as "a witness in an internal affairs investigation." (Pl.Ex. 102 at 1).

52. Brunt's interview of Lauretano became contentious, as Brunt was critical of Lauretano's investigation. Brunt was also critical of Lauretano's memorandum detailing his conversation with Ms. M. Brunt also questioned Lauretano about Lauretano's contacts with the media with respect to the Hotchkiss investigation.

53. During this interview, Brunt asked Lauretano about the source of Crown's fee. Lauretano stated that the fee was paid with funds received as an anonymous donation.

54. At the conclusion of the interview, Brunt stated the following to Lauretano: "you are ordered not [to] discuss any portion of the investigation except with legal counsel or union representative without prior approval of Labor Relations as requested through your Commanding Officer." (Pl.Ex. 102 at 33).

55. Lauretano considers Brunt's order "a direct order from Colonel Bardelli because Brunt reports to Colonel Bardelli, Colonel Bardelli is the complainant against me in the internal affairs investigation, and as you know Lieutenant Brunt testified that he reports directly to the colonel and the colonel only." (Tr. 525:9–15).

56. Prior to Lauretano receiving official notice of any charges against him, Bardelli commented to Connery regarding the substance of charges against Lauretano. (See Tr. 130:21–131:13).

57. On September 8, 1998 Sergeant George Battle notified Lauretano in writing that he was the subject of an internal affairs investigation "into allegations surrounding [Lauretano's] inappropriate investigative technique / misappropriation of

monies while conducting a criminal investigation involving a sexual assault . . . on or about 09/03/97." (Pl.Ex. 104).

58. The investigation commenced at the complaint of Bardelli. The complaint summary provides the factual basis for the complaint as the following:

During the course of the investigation, in October of 1997, prior to the [Hotchkiss] case being turned over to the Western District Major Crime Squad, TFC Lauretano took it upon himself to solicit donations to an outside vendor (Crown / Gates Associates) to conduct a videotaped interview with the sexual assault victim and evaluate same. At no time was TFC Lauretano's supervisor or commanding officer made aware of this investigative technique. After TFC Lauretano's attempt to solicit a donation was unsuccessful, he stated that he later received an anonymous $300.00 cash donation in a blank envelope slipped under his office door at the Salisbury Town Hall. . . . Upon receiving the $100.00 refund from Crown / Gates Associates, TFC Lauretano stated that he gave the $100.00 in assorted small bills to his son and had his son put it in the collection basket at St. Mary's church in Lakeville, but he has no receipt of this donation.

(Pl.Ex. 104 at 2).

59. On September 28, 1998, the CSP issued a statement relating its account of the sexual assault investigation and the IA investigation into the WDMC's conduct.

60. Lauretano stated that he disagreed with certain representations set forth in the CSP's statement.

61. On September 29, 1998, Ms. M spoke at a press conference regarding how the CSP treated her son. Ms. M also publicly requested that certain investigatory materials be released to the public,

including Crown's videotaped interview with her son.

62. On October 1, 1998, several newspaper articles reported that Ms. M stated that she never gave her consent to interview her son outside her presence.

63. On October 1, 1998, Brunt recommended that the WDMC officers named in Ms. M's complaint be exonerated. Barry adopted the recommendation on October 29, 1998. No individual involved in the interrogation of the boy was disciplined or reprimanded in any way in connection with the handling of that interview.

64. In October of 1998, Connery met with Bardelli in Bardelli's office to discuss the Hotchkiss case. Bardelli informed Connery that Lauretano was the subject of an IA investigation for falsifying an interview with the complainant and "pocketing" money.

65. On November 6, 1998, Brunt wrote to Ms. M and asked her to sign a release so that the CSP could obtain information directly from Crown regarding Crown's fee for services rendered.

66. Lauretano believes that Brunt's letter to Ms. M was deceptive in that Brunt's investigation had technically concluded on October 1, 1998, and that Brunt knew that Ms. M would not assist the CSP if she believed that Lauretano was the target of the investigation.

67. On November 25, 1998, Brunt stated in an interview that Lauretano was the subject of an internal affairs investigation.

68. On November 25, 1998, the *Republican–American* published a comment from Bardelli indicating that the internal affairs investigation related to the Hotchkiss case could result in new procedures and that Bardelli was concerned over how late the WDMC entered the investigation.

69. Maco crafted a letter to Lieutenant Roy Beavers of WDMC, dated December 9, 1998, stating reasons for his decision not to prosecute the Hotchkiss case.

70. In this letter, Maco stated that in November of 1997 the complainant had made accusations against administrators from his new school similar to those he made against the Hotchkiss students. Ms. M denied Maco's statement. Local newspapers published articles discussing Maco's statement and subsequent reports and investigations regarding the accuracy of the statement.

71. Lauretano believes that Maco published the December 9, 1998 letter in a deliberate effort to deflect criticism from himself and his office and shift the blame in the public eye to Lauretano. Lauretano believes that Maco's letter "impugn[ed] [Lauretano's] reputation as a state police officer, that [Lauretano] did a less than thorough investigation." (Tr. 100:10–11).

72. During his second interview with IA investigators, Lauretano informed them that he knew the source of funds for Crown's fee was in fact Mrs. Lauretano.

73. Lauretano believes that the IA investigation of his conduct was designed to intimidate him and prevent him from commenting in public about the case.

74. The IA investigation into Lauretano's conduct resulted in charges being brought against Lauretano. On January 21, 1999, Barry informed Lauretano, by letter, that he was charged with several violations of the CSP's Administration and Operations Manual. Barry ordered Lauretano to appear at his office on January 28, 1999 to discuss disciplinary action.

75. The charges against Lauretano can be summarized as follows: (1) Lauretano retained an expert to interview the complainant without approval from his superiors; (2) Lauretano solicited a $300.00

donation for Crown's fee; (3) Lauretano released his March 6, 1998 written account of his conversation with Mrs. M and the complainant on February 28 and March 1, 1998 directly to Mrs. M without proceeding through the proper Freedom of Information Act channels; and (4) Lauretano provided false information regarding the source of Crown's fee to Brunt and Corona when they interviewed him on August 27, 1998.

76. During the January 28, 1999 meeting with Barry, Barry and Lauretano's counsel discussed the possibility of Lauretano accepting a lesser form of discipline in exchange for Lauretano's agreement not to contest the discipline or grieve and arbitrate the decision. During breaks in the official meeting, during which Barry was speaking with Lauretano's counsel while Lauretano stood nearby, Barry complained about the ongoing media publicity, indicating that the CSP was very unhappy about it. Barry commented that he wanted media attention to stop and that Lauretano was not talk to the press. Lauretano overheard this conversation whereupon his attorney turned to him and communicated Barry's instruction to the effect that there better not be any statements to the media by Lauretano regarding this matter.

77. On January 30, 1999, the *Register Citizen* quoted Bardelli as having "significant concerns about procedures [Lauretano] took." (Pl.Ex. 43).

78. On January 31, 1999, the *Republican–American* reported that Bardelli stated that the CSP brought "about eight charges (against Lauretano), a few items dealing with record-keeping, primarily, and failure to notify his commanding officer on things he was doing." (Pl.Ex. 44).

79. When word of the conclusion of the IA investigation of Lauretano's conduct became public, Connery and Ms. M expressed the view that the charges against Lauretano were insubstantial and that the CSP was attempting to offer Lauretano as a scapegoat for any perceived lack of action on the part of Maco and the CSP.

80. Barry imposed a 60–day suspension and transferred Lauretano from his post as resident trooper in Salisbury to Troop L in Litchfield. Barry notified Lauretano by letter dated February 10, 1999 of his decision.

81. On February 12, 1999, a reporter from the *Republican–American* contacted Lauretano and sought his comment on Brunt's statement to her that Lauretano had been suspended for 60 days and that he was contesting the suspension. Lauretano prepared a memorandum to Captain Edward Lynch, the Commanding Officer of the Western District Headquarters, expressing his anger over Brunt's comment to the reporter about Lauretano's IA case.

82. On February 16, 1999, Lauretano filed a grievance challenging the disciplinary action against him. The parties agreed to arbitrate this grievance.

83. On February 24, 1999, the *Republican–American* published an article stating that Bardelli confirmed that the CSP found that Lauretano had committed "about eight violations." (Pl.Ex. 51).

84. On February 25, 1999, the *Lakeville Journal* published a piece written by Connery claiming that the CSP was punishing Lauretano in an effort to deflect criticism. Connery indicates that Bardelli revealed the IA investigation into Lauretano's conduct during an interview on October 9, 1998, and that Bardelli stated that Lauretano may have committed "financial improprieties." (Pl.Ex. 55 at 1).

85. On March 5, 1999, Barry responded in writing to Lauretano's memorandum to Lynch regarding Brunt's comments. Barry stated that Brunt, as the Commanding

Officer of the Internal Affairs Unit, "is authorized to conduct interviews with the media and has my full support with regards to this endeavor," and that "Brunt's statements to the Waterbury Republican in no way violated department policy or freedom of information guidelines." (Pl. Ex. 113).

86. Following his removal from the resident trooper post, a group of residents of Salisbury publicly called for Lauretano to be reinstated. Several newspaper articles reported the residents' reactions and thoughts concerning Lauretano's removal.

87. On March 31, 1999, the *Journal Inquirer* published a piece written by Andy Thibault, in which he asserts that other commentators and members of the media should not be criticizing the CSP for its handling of the Hotchkiss case. Thibault was critical of Lauretano, and defended the actions of Lauretano's superiors and fellow CSP officers. Thibault stated that he interviewed unnamed CSP officials in preparation for his article.

88. On April 1, 1999, the *Lakeville Journal* published an article noting that Lauretano had responded in writing to Maco's inquiries regarding Lauretano's arrest warrant drafts.

89. On April 11, 1999, the *Republican–American* reported that the state legislature commissioned a study regarding the recording of interrogations. The article discussed the Hotchkiss case as an example of why commentators believe that interrogations should be recorded.

90. On June 25, 1999, the *Litchfield County Times* published comments from Maco regarding Lauretano's role in investigating the Hotchkiss case. Maco stated that "[Lauretano] wanted us to make a decision immediately, and he was urging us to rush to judgment...." (Pl.Ex. 82 at 2). Maco also stated that the manner in

which the complainant's original statement was written could be construed as "coaching" the complainant. (*Id.*). Maco and DeNuzzo also indicated that Lauretano had omitted a previously noted inconsistency from one draft to a subsequent draft of the arrest warrant.

91. After a fully contested arbitration hearing conducted on February 1, June 6, September 12, and October 24, 2000, an arbitrator determined that the State had just cause for Mark Lauretano's 60–day suspension and disciplinary transfer.

92. In upholding his discipline, an independent arbitrator found among other things, that plaintiff made a "patently false" statement during the internal affairs investigation regarding the "anonymity" of funds that he received for a videotaped interview by a psychologist related to the "Hotchkiss complainant."

93. Lauretano commenced the instant action on June 8, 1999 and filed a motion for a preliminary injunction. The complaint sought damages for interference with first amendment rights and sought injunctive relief from this court against defendants' continued promulgation and application of the media policy to these circumstances.

94. After discussions between CSP officials and counsel for the defendants, Lauretano's superior officer at Troop L, Lt. Sweetman, issued a memorandum to Lauretano dated August 6, 1999. Sweetman stated that "[t]he purpose of this memorandum is to inform you that at the present time you are NOT prohibited from speaking publicly regarding the disciplinary action." (Pl.Ex. 115).

95. On September 7, 1999, Lauretano directed a memo of response to Sweetman indicating that he had numerous questions about the meaning of Sweetman's August 6, 1999 memo. Specifically, Lauretano

sought clarification about what Sweetman meant when he said that plaintiff could speak regarding. the "disciplinary action."

96. Sweetman never responded in writing to Lauretano's memorandum.

97. Lauretano directed another memorandum dated September 22, 1999 to Sweetman.

98. Sweetman did not respond in writing to this memorandum.

99. Lauretano believed that, pursuant to the A & O Manual, he needed written permission form a commander to conduct a press conference. Absent this permission, he feared reprisal from the CSP for speaking to the public.

100. On January 1, 2001, the *Connecticut Law Tribune* published a piece written by Thibault, in which he praised the CSP for its handling of the Hotchkiss case, and indicated that those who criticize the CSP as to the Hotchkiss case do so based upon an incorrect factual basis.

101. On January 29, 2001, the *Connecticut Law Tribune* published a letter to the editor written by Connery responding to Thibault's January 1 piece. Connery's letter was critical of the CSP and Maco, and he defended Lauretano's actions.

102. Lauretano wished to speak publicly about: his investigation of the Hotchkiss case; the WDMCS handling of the Hotchkiss case; Maco's handling of the Hotchkiss case; the IA investigation into the WDMCS handling of the Hotchkiss case; the IA investigation into his investigation of the Hotchkiss case; the arbitration process; and Brunt's letter to Ms. M.

103. Lauretano claims that Pagoni, Brunt, Corona, and Barry issued orders to him that he was not to speak to the media.

104. Lauretano believes that he remains subject to the orders not to speak to the media because the orders "have not been rescinded . . . unless [the orders] are rescinded by the same rank or superior rank, . . . the order still stands." (Tr. 524:4–7).

105. Lauretano believes that the CSP superiors would have considered him "belligerent" if he had requested that the orders instructing him not to speak be rescinded. (Tr. 537). Lauretano further stated that he "would have to request permission through an elaborate procedure to get to the colonel of the state police, who lodged a complaint against me. He's going to give me permission to go out and talk about him, having said that I stole something? And falsified the boy's statement? It makes no sense, sir." (Tr. 537:20–25; *see id.* 554:18–21 ("[Pagoni] gave me an order and the order stood. It would be up to him in the chain of command to rescind that order, not for me to go question him, antagonize him, my superior officer, after he's given me an order.")).

106. The Administration and Operations Manual ("A & O Manual") is a policy guide for troopers to assist them in performing their tasks. Each trooper maintains a copy of the A & O Manual, and is responsible for the information contained therein.

107. The A & O Manual is updated through an administrative process beginning with the promulgation of general orders.

108. The fourth edition of the A & O Manual, which was published on May 1, 1998, was in effect as of that same date.[10]

---

**10.** Lauretano's original motion for a preliminary injunction, which is dated June 8, 1999, references a different version of Chapter 8 of the A & O Manual than that offered as Plaintiff's Exhibit 90, which is the version of Chap-

(*See* Pl.Ex. 90). As of February 19, 2003, each trooper's A & O Manual had incorporated all general orders issued through December 31, 2001.

109. Once the commanding officer has signed a general order, the order is forwarded to the CSP research and planning department for distribution throughout the CSP. After a general order is promulgated, at least three to four copies are sent to each post. These copies are sent via interdepartmental mail and are mailed personally by Sergeant George Battle who works at the research and planning department.

110. After general orders are dispatched to the individual CSP posts, they are stored in each post's "General Order Book" and are not immediately dispersed to each individual trooper.

111. General orders are also posted in each post's "Read and Sign Book." The "Read and Sign Book" is a chronological compendium of communications from CSP command, including general orders, and each trooper is responsible for periodically viewing its contents and acknowledging, in writing, that he or she has been advised of the communication. Generally, with respect to each written communication, a roster sheet is placed in the "Read and Sign Book" with a blank space next to each trooper's name to initial that he or she has viewed the respective communication posted.

112. A trooper is accountable for following a general order when he or she acknowledges, in writing, that he or she has read the order, or within thirty days of the general order being posted in the post's "Read and Sign Book." (*See* Tr. 1346:5–24).

113. At the end of the calendar year, when all general orders have been promulgated, packets are provided to each individual trooper for the purpose of incorporating the changes effected by the preceding year's general orders. Each trooper replaces superceded pages of his or her A & O Manual with the updated pages included in the packet.

114. Prior to replacement pages being distributed, a trooper may make a copy of a general order.

115. Every command post has a general order book for each year, including Troop B.

116. Periodically, throughout any given year, an index outlining all of the general orders promulgated during that year is distributed.

117. The indexing of general orders is one of the stopgaps to make sure troopers do not miss a particular general order; with each new mailing, there is a new index that indicates not only what is in the particular mailing, but also anything that has been previously issued.

118. In 2002, there were four distributions of general orders to the field in January, May, August and November.

119. On January 17, 2002, Barry signed General Order 02–01, thereby modifying Sections 8.1.1 and .14.2.2b of the A & O Manual regarding the dissemination of public information.

120. The changes in Chapters 8 and 14 reflected in General Order 02–01 are the operative policies presently in effect at the CSP.

121. Lauretano resumed his position as Salisbury resident trooper in January 2002.

122. Troop B has a master copy of the A & O manual referred to in this hearing

ter 8 promulgated in the fourth edition of the A & O Manual.

as the "Troop Copy." (Tr. 1426–1427, 1439).

123. Every trooper has access to the Troop A & O Manual on a 24 hour per day basis for reference purposes; the troop copy may not be complete because troopers take things to copy and fail to return pages.

124. As of April, 2002, Sergeant Barbara Festa was assigned to maintain the Troop A & O Manual and the Trooper General Order Book.

125. In addition to the Troop A & O Manual, Festa maintains the Sergeant's copy of the A & O Manual, which is kept in the unlocked Sergeant's office and is accessible at all times to all troopers for reference purposes.

126. The 2002 General Order Book, which contains copies of all general orders passed in 2002, is maintained by Festa and kept on the bookshelf in the Sergeant's office.

127. Each trooper has access to the General Order Book in the Sergeant's office 24 hours per day.

128. Festa updated the General Order Book twice in 2002: once in August and then in December.

129. Festa maintained the General Order Book in chronological order. The general orders were numbered and filed in accordance with the accompanying index.

130. The "Read and Sign Book" is, by nature, readily accessible; if people take items from this book, the items will be gone.

131. General Order 02–01 was received by Troop B as part of a packet of other general orders in early August of 2002.

132. Festa placed General Order 02–01 into the Troop A & O Manual on August 9, 2002.

133. On January 29, 2003, General Order 02–01 was under file respectively under Chapters 8 and 14 in the Troop A & O Manual.

134. Festa also placed General Order 02–01 in her personal A & O Manual, in the General Order Book, and in the troop "Read and Sign Book" with an accompanying roster sheet for the entire packet of general orders received in August of 2002 on August 9, 2002.

135. Neither General Order 02–01 nor the accompanying roster sheet for the packet of general orders received in August of 2002 has been located.

136. In January of 2003 General Order 02–01 was in the Troop B General Order Book.

137. On November 29, 2002, Sergeant Mohl posted a general order list in the Read and Sign Book covering General Orders 02–01 through 01–21.

138. Because there is no evidence that Lauretano actually viewed General Order 02–01, or the accompanying general order index posted therewith on August 9, 2002, November 29, 2002 could have been the first time Lauretano became aware, through a "Read and Sign Book" posting, of the existence of General Order 02–01.

139. General Order 02–10 modified the media policy and was posted by Festa in the General Order Book on December 1, 2002.

140. The posting on November 29, 2002 and December 1, 2002 included an index demonstrating, by title, changes to the A & O Manual.

141. Lauretano initialed the Read and Sign roster for the 2002 general order list.

142. Lauretano was accountable for following General Order 02–01 as of December 29, 2002.

### 3. Discussion

Against the background of the facts set forth herein, as seen through the prism of the *Pickering/NTEU* analysis, the following issues take shape. First, the court must determine whether Lauretano's proposed speech is worthy of First Amendment protection because it relates to matter of public concern. Second, if his proposed speech is worthy of protection, the court must determine to what extent, if at all, the CSP media policy unduly restricts his proposed speech. Third, the court must balance the value of Lauretano's proposed speech against the CSP's justification for restricting it.

#### a. Public Concern

■ The threshold issue in this lawsuit is whether Lauretano's proposed speech relates to matters of public concern such that it is worthy of First Amendment protection. *"Pickering's* balancing test applies only when the employee speaks 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest.'" *Harman v. City of New York,* 140 F.3d 111, 117 (2d Cir.1998) (quoting *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. As such,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency

allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999).

■ Under the circumstances of this case, the court must draw a fine distinction. One view of Lauretano's proposed speech is that he was taking issue with his employer's decisions, not unlike many employees do of their supervisors. *See Urofsky v. Gilmore,* 216 F.3d 401, 407 (4th Cir.2000) (en banc) ("Thus, critical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.'") (quoting *Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986)), *cert. denied,* 531 U.S. 1070, 121 S.Ct. 759, 148 L.Ed.2d 662 (2001) (alteration in original). For example, Lauretano wished to criticize the State's Attorney's decision to allow the search warrant to become available for public inspection, the State's Attorney's decision to not seek an arrest warrant after Lauretano had submitted several drafts, the CSP's decision to interview the alleged victim for the sixth time outside the presence of his mother without the use of a video-recording device, and, ultimately, the decision to investigate Lauretano's conduct and impose discipline. Taken individually, these are all decisions that are arguably committed to the discretion of Lauretano's superiors. Arguably, therefore, any comment Lauretano might offer would be a mere difference of opinion with his supervisors regarding how they conducted their appointed tasks, and not a

matter of public concern worthy of First Amendment protection. *See Connick,* 461 U.S. at 149, 103 S.Ct. 1684 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case."); *Roe v. City of San Diego,* 356 F.3d 1108, 1115 (9th Cir.2004) ("The public concern test was thus intended to weed out claims in which an adverse employment action is taken against an employee for complaining about internal office affairs, such as the employee's conditions of employment or job status.").

■ This is not to say that an employee's criticism of an employer's decision will never be protected. A corrupt or otherwise improper decision is the most obvious example of an instance where the employee's comment upon the decision would necessarily be of public concern, and courts have vigilantly protected an employee's right to expose public misconduct. As a decision passes through the hypothetical continuum between "corrupt" and "unquestionably valid," however, it becomes difficult to decide the place along the continuum that criticism of the decision ceases to be a matter of public concern. *See Roe v. City of San Diego,* 356 F.3d at 1115 ("The Supreme Court did not articulate a precise definition of 'public concern' but concluded that an employee's *job related* speech relates to a matter of public concern when it is relevant to the public's evaluation of the government employer's performance.") (emphasis in original); *Nichol v. ARIN Intermediate Unit 28,* 268 F.Supp.2d 536, 558 (W.D.Pa.2003) ("On the other side of the public concern coin [from comments upon matters outside the issues of the workplace], and presenting more complexity, are employees' comments directed internally at issues in or affecting the workplace, ranging from idle office gossip and chit-chat (usually not public concern speech) to comments about safety, performance, corruption and other such larger issues of general interest to the public (usually deemed to be matters of public concern)."). The first view of Lauretano's proposed speech is based upon this premise: an employee's comment about his employer's questionable decisions is ordinarily not a matter of public concern. Because, under this view, the decisions identified by Lauretano are not sufficiently egregious in and of themselves to be worthy of public debate, Lauretano's proposed commentary is not protected.

Another view of Lauretano's proposed speech, however, might warrant First Amendment protection. According to the second view, Lauretano's proposed speech is not a criticism of his employer's isolated decisions, but rather commentary regarding a systematic failure in the way that the CSP handled the Hotchkiss case. For example, one could view Lauretano's proposed speech as using the Hotchkiss case as an example of the shortcomings of the investigatory process leading to an untoward result: graphic details prematurely revealed, lack of coordination between CSP investigators, lack of a uniform or adequate policy regarding interviews with minors, reluctance of the prosecution to take on a sensitive case, and the offering of a sacrificial lamb to the public to explain the unseemly result and cover systematic shortcomings. Viewed through this lens, the individual decisions Lauretano seeks to comment upon are merely symptoms of a perceived greater illness. Arguably, therefore, Lauretano would be joining a debate regarding the CSP's policy with respect to investigating and prosecuting sexual assault cases with minor victims, and his speech would be protected because it transcends ordinary workplace issues. *See Harman,* 140 F.3d at 118 ("[D]iscus-

sion regarding current government policies and activities is perhaps the paradigmatic matter of public concern. ...")(internal quotation marks omitted).

Lauretano's motive for wanting to speak (according to *Connick*) and the context of the public debate (according to *Rankin*) inform the court's choice between these two viewpoints. *See Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999) (stating that when a court determines whether the employee's speech addresses a matter of public concern, "the court should focus upon the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."). The Court of Appeals for the First Circuit has persuasively elaborated the reasoning behind this inquiry as follows:

> Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression.... On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone,* as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete *Connick* analysis into the form and context of the public-employee expression, "as revealed by the whole record," *Connick*, 461 U.S. at 148, 103 S.Ct. 1684, ... with a view to whether the community has *in fact* manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse. Since "almost anything that occurs within a public agency *could* be of concern to the

public," *Terrell [v. University of Texas System Police]*, 792 F.2d [1360,] at 1362 [(5th Cir.1986)](emphasis in original), a full-fledged "form and context" analysis is appropriate in these instances.

*O'Connor v. Steeves*, 994 F.2d 905, 913–14 (1st Cir.) (citations omitted, emphasis in original), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). Because the content of Lauretano's proposed speech, standing alone, does not necessarily mandate First Amendment protection, an extended inquiry into the form and context of his proposed speech is necessary to determine whether his proposed speech warrants protection.

Lauretano testified, at length, that he desired to speak to the public regarding the Hotchkiss case and the subsequent imposition of discipline upon him. His motivation for wanting to speak is complex. On a lengthy direct examination, Lauretano testified on several occasions that he wanted to speak out, either internally within the CSP or externally to the general public, with respect to the subject matter of several newspaper articles written during the course of events in the Hotchkiss case. Certainly, Lauretano desired to defend his reputation from what he perceived to be derogatory comments about his ability and character made by (or attributed to) his superior officers. (*See* Tr. 463:15–19 ("Q. At what point in time did you develop the desire, if at any time, to speak publicly about your investigation of the Hotchkiss case? A. As soon as Colonel Bardelli and Lieutenant Brunt were out talking to the press...."); Tr. 511:25–512:7 ("What I can tell you is that during this whole investigation, while [CSP officials] were speaking openly about me and I was ordered not to be able to speak, eventually this led me to trying to hire an attorney to be able to get my story out, because I was being defamed by the Con-

necticut State Police over a three-year period in countless articles and in countless newspapers where they were able to speak and I wasn't."); Tr. 573:10–19 ("I would say that some point where those internal affairs, the internal affairs investigation was released, okay, without notifying me that it was going to be released, and that there were all kinds of detrimental comments made about me by the major crime squad in there, my interview, they took my interview out, gave a one-sided version, handed it over to the [person], at that particular point I would say absolutely, because I wanted to defend my honor, and they called me all kinds of things in that internal affairs investigation."); Tr. 594:10–18 ("Q. When you learned of the contents of [Maco's December 8, 1998 letter], did you want to respond publicly regarding the allegation in there outside of the state—some forum outside of the state police? A. Yes, absolutely. Q. And the reason you wanted to do so was because you felt that the letter questioned your honor? A. I felt that I was insulted by the state's attorney's office.")).

The evidence in the record also indicates that Lauretano wished to express his dissatisfaction with the manner in which the CSP and State's Attorney's Office conducted the Hotchkiss investigation, both internally within the CSP (see Tr. 570:4–7), and, at some point in time, through the media. (See Tr. 623:4–11) ("I think that these issues were all of public concern, and that the public needs to know certain things, and we've gone over many of them." The arrest warrant applications not being sealed, et cetera, et cetera. ·There are so many different things to go over, including the fact that I felt I was being scapegoated with these articles. I was being ordered not to speak over many months to defend myself, et cetera, et cetera."); Tr. 746:13–747:1 ("Q. . . . When you heard about this complaint that was coming in connection with the [WDMC's February 28, 1998] interview [with the complainant], the recantation, were you upset because you considered four months of your work was going to waste? Or were you concerned for other reasons? A. I was concerned about the state police and how this was going to look, and I felt that that, and after speaking to Sergeant Hyatt, I felt that [the WDMC officers] were basically hoodwinked because they were not provided with the videotape recording of the boy's interview, and they should have been provided that by Mr. Maco, and I was concerned for the state police, because I had run into this, I had run into what I call Mr. Maco fence sitting . . . . ").

One exchange between Lauretano and the court is indicative of the complexity of Lauretano's motivation:

THE COURT: Okay. Did you want to defend yourself, or did you want to defend or talk about the policy of how things like this were handled within the department? In other words, were you worried about yourself? Or were you worried about the total department and how it was being perceived as a result of its involvement in this case?

THE WITNESS: I think that they're intertwined, your Honor.

THE COURT: Then say it.

THE WITNESS: I believe they're intertwined. There are so many different issues here, and emotions arose over a period of time regarding so many different facets. This case went into a different turn every day with different articles that came out.

THE COURT: So you're worried about yourself?

THE WITNESS: Yes.

THE COURT: You were being improperly portrayed in the press?

THE WITNESS: Yes, your Honor.

THE COURT: And also you were upset because the police department was being portrayed as not doing their job properly and you were part of the police department?

THE WITNESS: That's true, your Honor. I serve in uniform. I'm in the public eye. And I'm also concerned about the state police image, including mine. It's intertwined, if you understand, your Honor.

(Tr. 619:13–620:14).

Although Lauretano's motivation for wanting to speak is complex, the record supports a finding that he was, at the very least, in part motivated by a desire to join a public debate regarding the propriety of CSP procedure. *See Havekost v. U.S. Dept. of Navy*, 925 F.2d 316, 318 (9th Cir.1991) ("One critical inquiry is whether the employee spoke in order to bring wrongdoing to light or merely to further some purely private interest."); *Berg v. Hunter*, 854 F.2d 238, 242–43 (7th Cir. 1988) ("Although the point or motive behind an employee's speech is relevant in determining whether matters of public concern are implicated by that speech, motive alone is not dispositive. A fair reading of *Connick* simply will not support the use of such a litmus test. Despite the Court's explicit finding that Myers's questionnaire was motivated by a personal dispute, ... the content of her speech was paramount to the Court's finding that a public issue was implicated."). Because he was at least partially motivated by a desire to contribute to an ongoing public debate, Lauretano would have likely participated by speaking out in a manner that would have enhanced the public debate. The record also supports the conclusion that there was, and indeed still is to some degree, a public debate regarding the topics about which Lauretano wished to speak between Bardelli, Connelly, Maco, Connery, and others. The circumstances of the public debate were and are such that Lauretano would be able to contribute. Therefore, although the topic of Lauretano's proposed speech in and of itself does not necessarily mandate protection, the form and context of his proposed speech requires that his proposed speech be protected. *See Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir.1996) ("This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace.") (emphasis in original); *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983) ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies.").

The fact that a portion of Lauretano's proposed speech does not touch upon an matter of public concern, or that part of his motivation for speaking is to respond to aspersions cast upon him, does not alter this conclusion.[11] Under certain circumstances, such as those present in *Arndt v. Koby*, 309 F.3d 1247 (10th Cir.2002), "[s]peech intended to redress public perceptions of an individual officer's incompetence generally does not constitute speech on a matter of public concern," (dkt. # 93 at 16). *See Arndt*, 309 F.3d at 1254 ("The fact that Ms. Arndt was a police detective working on a murder investigation which had garnered tremen-

---

11. Also, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

dous media attention does not alone transform her speech designed to refute media criticisms of her personal, individual competence in that particular investigation into speech on a matter of public concern."). When faced with this issue in *Connick*, however, the Supreme Court did not adopt an "all or nothing" approach to determining whether an employee's speech was protected. Rather, the Supreme Court identified a particular portion of the plaintiff's speech that was worthy of protection, even though the majority of her speech was not protected. *See Connick*, 461 U.S. at 149, 103 S.Ct. 1684 ("One question in Myers' questionnaire, .however, does touch upon a matter of public concern.").

Declining to espouse a narrow view of Lauretano's proposed speech, and his motive therefor, is consistent with *NTEU* and its progeny. As discussed herein, *NTEU* instructs the court to consider the spectrum of possible speech affected by the policy restricting speech. *See NTEU*, 513 U.S. at 468, 115 S.Ct. 1003 (requiring the Government to demonstrate that its interests outweigh the interest of "both potential audiences and a vast group of present and future employees in a broad range of present and future expression"). Although *NTEU* certainly does not require the court to strain its imagination in extrapolating matters of public concern from an employee's proposed speech, to ignore earnest efforts to contribute to a public debate because the employee's articulation of his proposed speech does not fit squarely within the confines of the traditional model for protected speech would undermine the purpose of *NTEU's* expanded inquiry. For these reasons, the court finds that Lauretano's proposed speech relates to matters of public concern.

### b. Policy Language

Because Lauretano's proposed speech relates to matters of public concern, the court must, under the *Pickering/NTEU* balancing test, weigh the CSP's interest in promulgating the above-mentioned restrictions against both Lauretano's and the public's right to publicly discuss certain matters relating to the Hotchkiss case. Prior to balancing the parties' respective interests, however, the court must determine the scope of the CSP media provisions.

Lauretano challenges the validity of following provisions of Fourth Edition of the Department of Public Safety Administration and Operations Manual ("A & O Manual") under the First Amendment: 8.1.1c;[12] 8.1.2a(3) & (4); 8.1.2b(2)(a) & (5)(m); 8.1.2c(1)-(4); 8.1.2i(6)(a) & (b); 8.1.2j(1),(2),(3),(6)(a)-(g) & (j); 8.1.6 a(2)(a) & (b); and 14.2.2b (29),(68),(69) & (74).[1314] With respect to public comments in general, the policy provides the following:

*Making official comments*

> Department employees shall not identify themselves as authorized spokespersons or representatives of this department

---

12. This provision has been amended after the filing of Lauretano's motion. As discussed herein, the amended provisions applied to Lauretano as of December 29, 2002.

13. Certain provisions of Section 14.2b were also amended by General Order 02–01. Lauretano has also challenged the following subsections of Section 14.2.2b as they appeared prior to the amendments implemented by General Order 02–01:(28),(29),(66),(67) and (73).

14. Lauretano mentions Section 14.2b(74), which was formerly numbered Section 14.2b(73), as a provision he wishes to challenge, but neither of the parties have posited that this provision applies to Lauretano's proposed speech. Absent a specific reference, the court will not pass upon this provision's constitutionality.

and discuss department policy or make official comments relative to department policy to members of the news media or to the general public without obtaining prior permission to do so from a district or bureau commander, who shall first clear the request with the commissioner through the chain of command. (Def.Ex. G, § 8.1.1c). Section 14.2b, which is part of the CSP Rules of Conduct and enumerates specific disciplinary offenses, describes the offense of "Policy Comments" in identical terms. (*Id.*, § 14.2b(68)).

Further, the policy provides that, because "law enforcement activities are high in the public interest" and that cooperation with, and respect for, members of the news media "allow both groups to successfully provide public information and services," there is a need for a "Public Information Officer" ("PIO"). (Pl.Ex. 90, § 8.1.2a). The policy enumerates specific procedures for responding to requests for information from members of the news media and the role of the PIO in responding to these requests. (*See id.*, § 8.1.2). Included in the PIO provisions are several instances where "troopers" are required to notify and consult with the PIO prior to releasing certain information, including information related to personnel and disciplinary matters, Internal Affairs investigations, claims or charges against personnel, department policy, editorial responses and investigations or arrests involving state agencies, other law enforcement agencies, or public officials. (*See id.*, § 8.1.2j(6)). Also, the policy provides that "[r]adio, television or print interviews may be authorized only by commanders or by PIO staff," (*id.*, § 8.1.2c(1)), and that "[r]equests for radio, television or print interviews or other queries regarding department policy, department employees, disciplinary matters or internal affairs investigations shall be referred to PIO," (*id.*, § 8.1.2c(4)).

Thus, to the extent it applies, the policy prohibits unauthorized comments and imposes further restrictions regarding the release of certain other information by requiring clearance from the PIO.

The policy also references the rights of employees to speak. Specifically, the policy provides the following:

### Trooper rights: freedom of expression

(a) A trooper acting as a private citizen is entitled to exercise any lawful right of freedom of expression as may be granted by the Constitution of the United States, the Constitution of the State of Connecticut, or applicable federal or state statutes, laws and regulations.

(b) A trooper identifying himself as a member of this department is nevertheless bound by certain restrictions on public speech or activities as described in this manual. (Note: A & O Sections 8.1.1–8.1.6, inclusive, Sections 13.1 & 13.1.2, and the applicable subsections of Section 14.2.2b.)

(c) The restrictions on speech as identified in this policy are listed as general guidelines. Troopers are encouraged to seek guidance from their commanding officers.

(Def.Ex. G, § 8.1.1c(3)). Trooper expression is also limited by the following prohibition:

No employee shall make public comments that, on balance, impair discipline by superiors or harmony among coworkers, have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impede the performance of a speaker's duties or interfere with the regular operation of the department.

(*Id.*, § 14.2b(69)).

The CSP characterizes the restrictions on employee speech set forth in the policy

as "exceptionally narrow." The CSP argues that the policy imposes restrictions on employee speech only when employees "identify themselves as authorized spokespersons or representatives of this department and discuss department policy or make official comments relative to department policy to members of the news media or to the general public. . . ." (Def.Ex. G, § 8.1.1c). The CSP interprets this language to limit application of the restrictions to situations where "troopers [are] acting within the scope of their official duties," and claims that the "CSP policy does no more than advise its employees that they may not (1) publicly represent themselves to be authorized spokespersons of the agency without prior approval; or (2) disclose information protected · by law." [15] Of course, the CSP may lawfully control its employee's speech when the employees are speaking as part of their official duties. *See Urofsky*, 216 F.3d at 407 ("This focus on the capacity of the speaker recognizes the basic truth that speech by public employees undertaken in the course of their job duties will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs."). Thus, the CSP argues that "[t]he policy's narrowly defined proscription on speech, coupled with textual acknowledgment of employees' First Amendment rights, satisfies the concerns set forth in analogous cases. . . ."

Lauretano argues in response that the policy does not precisely distinguish between employee speech as part of the employee's official duties, which may lawfully be restricted, and employee speech on workplace topics of public concern not of-fered within the scope of the employee's official duties, which may not be categorically proscribed. Lauretano argues that "[t]he issue of speaking as a purported 'authorized *spokesperson*' is not at play in this case as plaintiff does not challenge this aspect of the policies. But troopers who wish to speak out about agency affairs would necessarily identify themselves as Connecticut State Troopers." Lauretano contends that the terms "authorized spokesperson," "representative of the department," and "member of this department" are not synonymous; in fact, Lauretano points out a fourth term, "official representative of the department," used in the same provision of the policy, (Def.Ex. G, § 8.1.1g(3)), which discusses protocol for wearing the CSP uniform. In the context of the facts of this case, Lauretano argues that his proposed speech regarding the Hotchkiss case would be necessarily offered as a "member of the department," and thereby subject to clearance from his commanding officer and possibly the PIO.

The policy language itself does not support the interpretation advanced by the CSP. Even within the key provision of the policy, the CSP uses three different terms to notify troopers that the restrictions on communications to the public apply. The flush language of Section 8.1.1c provides that employees identifying themselves as *"authorized spokespersons* or *representatives of this department"* must obtain permission to make "official comments relative to department policy." Section 8.1.1c(3)(b) provides, however, that *"[a] trooper identifying himself as a member of this department* is nevertheless bound by certain restrictions on public speech or activities as described in this manual." Assuming, arguendo, that the terms "au-

---

**15.** Lauretano does not challenge the provisions of the policy prohibiting disclosure of confidential information.

thorized spokesperson" and "representative of the department" are synonymous, the court must also construe the term "member of this department" to be identical to the two preceding terms in order to support the CSP's interpretation of the policy.

The policy language does not sustain the CSP's interpretation of the policy. The term "representative" means, in this context, "standing or acting for another [especially] through delegated authority," *Merriam–Webster's Collegiate Dictionary* at 990 (10th ed.2002), and the term "spokesperson" means "a person who speaks as the representative of another or others often in a professional capacity," *id.* at 1133. The term "member," on the other hand, means "one of the individuals composing a group," *id.* at 723, and does not intimate any authority to speak or act on behalf of other members of the group.

The significance of the use of the specific term "member" in Section 8.1.1c(3) cannot be understated. Section 8.1.1c(3) notifies troopers when the restrictions on speech set forth in other provisions of the A & O Manual apply. Subsection (a) tells troopers when the restrictions are not applicable, while subsection (b) informs troopers when the restrictions are applicable. These provisions set forth a bright line rule regarding the applicability of the restrictions. Regardless of whether the flush language of Section 8.1.1c could be interpreted consistent with the CSP's contentions, the language of Section 8.1.1c(3) is clearly and unambiguously far broader.

As evident by the facts of this case, the policy, by its terms, restricts protected speech. The parties would, of course, agree that Lauretano must comply with the provisions of the media policy to say

the following: "Speaking on behalf of the CSP, our policy of not requiring all interviews with minor complainants to be recorded must be changed." Under the policy, however, it is not clear whether Lauretano could say the following without complying with the media policy procedures: "I am a member of the CSP. I think the CSP policy of not recording interviews with minor complainants must be changed," or, if the listener already knew or could easily discern that Lauretano was a member of the CSP: "I think the CSP policy of not recording interviews with minor complainants must be changed." In other words, Section 8.1.1c(3)(b) applies to situations where a trooper speaks on his or her own behalf, but the speech is valuable to the general public only because the speaker is a member of the CSP. With respect to the example discussed herein, Lauretano's view regarding the CSP minor interview policy is valuable to the public only because he speaks from his experience as a member of the CSP, although not as a CSP spokesperson. Because this type of speech falls within the purview of Section 8.1.1c(3)(b), it is therefore restricted by other provisions of the policy.

The CSP argues that its policy is similar to that at issue in *Shelton Police Union v. Voccola,* 125 F.Supp.2d 604 (D.Conn.2001), where the court, after applying the *Pickering/NTEU* balancing test, found that the government had met its burden of justifying the restrictions on employee speech set forth in the written policy at issue in that case.[16] *See id.* at 626. The policy at issue in *Shelton Police Union* provided the following:

---

16. The court did find, however, that the government had unconstitutionally applied the written policy to the plaintiff in violation of

the First Amendment. *See Shelton Police Union,* 125 F.Supp.2d at 630–34.

all formal releases to the press are to be disseminated through the media relations' officer, assigned by the Chief of Police or in the absence of such media relations' officer by the commanding officer. No member of the department shall release any information relating to pending investigations or any information not otherwise available to the public if such information is exempt from public disclosure pursuant to the Freedom of Information Act.

*Id.* at 622. The court held that this provision

restricts employees' interests in free speech only in the context of "formal releases" and confidential information. At the same time, the Rule addresses the government's significant interests in keeping statutorily protected information confidential, protecting information about pending investigations, and approving any public statements released on behalf of the police department. Balancing these interests, the court finds that the government has satisfied its burden of demonstrating that its interests in confidentiality and effectiveness outweigh police officers' interests in speaking for the department or releasing confidential information.

*Id.*

The policy at issue in *Shelton Police Union* and the CSP policy are markedly different. The restrictions set forth in the CSP policy apply to "[a] trooper identifying himself as a member of this department." The dispositive inquiry in determining whether the CSP policy restrictions apply is the capacity of the speaker, and not the nature of the information. The *Shelton Police Union* policy, in contrast, imposes restrictions upon two categories of information: (1) formal releases; and (2) confidential information. The restrictions set forth in the CSP pol-

icy therefore apply to any speech uttered by "[a] trooper identifying himself as a member of this department," regardless of the nature of the speech.

The CSP media policy, by its terms, restricts speech regarding matters of public concern beyond that spoken by a trooper acting as a CSP spokesperson. Therefore, the effect upon the speaker and the general public must be weighed against the CSP's justification for the restrictions.

### c. *Pickering* Balancing

 Upon finding that Lauretano's proposed speech relates to matters of public concern, and that the plain language of the policy restricts Lauretano's proposed speech, the CSP "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731). "Under the *NTEU* test, where the government singles out expressive activity for special regulation to address anticipated harms, the government must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" *Harman*, 140 F.3d at 121 (quoting *NTEU*, 513 U.S. at 475, 115 S.Ct. 1003) (internal quotation marks omitted). Further,

[a]lthough government predictions of harm are entitled to greater deference when used to justify restrictions on employee speech as opposed to speech by the public, such deference is generally accorded only when the government takes action in response to speech which has already taken place.... Where the predictions of harm are proscriptive, the government cannot rely on assertions,

but must show a basis in fact for its concerns.

*Id.* at 121–22 (citation, footnote omitted).

The Court of Appeals for the Second Circuit had occasion to apply this balancing test in *Harman v. City of New York*, 140 F.3d 111 (1998). In *Harman,* the Court of Appeals affirmed the district court's final judgment enjoining the enforcement of the City of New York's Human Resources Administration and Child Welfare Administration media policy. *Id.* at 124. In pertinent part, the media policy at issue provided the following:

communications with the media must be coordinated to assure that the Agency is able to fulfill its mission effectively, and within the legally imposed requirements of confidentiality. For this purpose, the ACS Media Relations Office has been designated ACS's principal avenue of communications with the press. All contacts with the media regarding any policies or activities of the Agency—whether such contacts are initiated by media representatives or by an Agency employee—must be referred to the ACS Media Relations Office before any information is conveyed by an employee or before any commitments are made by an employee to convey information. The ACS Media Relations Office will determine the appropriate manner in which to handle media contacts regarding Agency policies or activities, including the appropriate person or persons to make such contacts, consistent with the efficient and effective operation of the Agency and the achievement of its objectives.

*Id.* at 116. Plaintiff Harman was suspended for making the following statements to World News Tonight: "The workers who are considered the best workers are the ones who seem to be able to move cases out quickly;" and "There are lots of fatali-

ties the press doesn't know anything about." *Id.* at 116. Harman and another City worker, Stadler challenged the media policy, and the district court held that the policy violated the First Amendment. *See id.* at 117.

The Court of Appeals applied the *Pickering/NTEU* balancing test and found that the media policy violated the plaintiffs' First Amendment rights. Upon finding that the plaintiffs' actual and proposed speech regarded matters of public concern, and that there was a public debate about the referenced topics, the court held that the City failed to meet its burden of justifying the prior restraint upon employee speech. *See id.* at 124. The court considered the City's proffered justifications, including the protection of confidential information and agency efficiency, and held that the City failed to justify the broad prohibitions set forth in the policy. *See id.*

This case is indistinguishable from *Harman.* Like the plaintiffs in *Harman,* Lauretano "possesses [an] interest, as [a] citizen[ ], in being able to comment on matters of public concern," and his interest "go[es] to the core of the freedoms the First Amendment was designed to protect." *Harman,* 140 F.3d at 118. As discussed herein, Lauretano has expressed his desire to speak about an alleged systematic failure in the way that the CSP handled the Hotchkiss case. In light of the fact that there was, and to some extent still is, an "ongoing public debate" regarding this alleged systematic failure, and that Lauretano was intimately involved in the investigation, "[t]he public has a significant interest in hearing" Lauretano's comments regarding the CSP's handling of the Hotchkiss investigation. *Id.* at 119.

The CSP media policy operates as a prior restraint on protected speech. The CSP media policy imposes the following

restrictions upon employee speech applicable to Lauretano's proposed speech: (1) the PIO "shall arrange for and assist at news conferences," (Pl.Ex. 90, § 8.1.2a(4)); (2) a trooper shall refer "[r]equests for radio, television or print interviews or other queries regarding department policy, department employees, disciplinary matters or internal affairs investigations" to the PIO, (id., § 8.1.2c(4)); (3) the "PIO shall assist and advise troopers with their dealings with the news media and the general public," (id., § 8.1.2j(1)); (4) "[i]nformation disseminated from department files shall be processed through the PIO," (id., § 8.1.2j(2)); (5) "[t]roopers are encouraged to seek assistance from PIO in routine matters and must do so when concerned with significant or sensitive matters," (id., § 8.1.2j(3)); and (6) "PIO shall be notified and consulted prior to providing information concerning any of the following subjects: (a) Personnel matters; (b) Disciplinary matters; (c) Internal Affairs investigations; (d) Claims or charges of misconduct against personnel; (e) Department policy; [and] (f) Editorial responses," (id., § 8.1.2j(6)(a)-(f)). The aforementioned restrictions "allow the [CSP] to determine in advance what kind of speech will harm agency operations instead of punishing disruptive remarks after their effect has been felt." *Harman*, 140 F.3d at 119. "for this reason, the [policy] runs afoul of the general presumption against prior restraints on speech." *Id.*

The CSP media policy raises a myriad of concerns addressed in detail in *Harman*. First, "a preclearance requirement may have a broad inhibiting effect on all employees, even those who might ultimately receive permission to speak." *Id.* at 120. Second, "the prior approval mechanism allows the [CSP] to control the timing of the intended speech." *Id.* Third, the policy vests the CSP with the discretion to determine who may speak. *See id.*

In sum, "[b]y mandating approval from an employee's superiors, they will discourage speakers with dissenting views from coming forward. They provide no time limit for review to ensure that commentary is not rendered moot by delay. Finally, they lack objective standards to limit the discretion of the agency decision-maker." *Id.* at 121. For these reasons, the CSP media policy violates the First Amendment.

The CSP's attempts to meet its burden under the *Pickering/NTEU* balancing test are based entirely on their interpretation of the policy, which this court has previously rejected. As stated herein, the plain language of the media policy does not limit its application to instances where the employee speaks as an official spokesperson or representative of the CSP. Further, Lauretano admits that, in this context, he does not challenge the CSP provisions protecting confidential information. Having failed to persuade the court that application of the media policy should be so narrowed, the CSP has no justification for the restrictions set forth in the media policy. The court therefore finds that, under the *Pickering/NTEU* balancing test, the restrictions upon employee speech set forth in the CSP media policy are unconstitutional and unjustified.

Prior to discussing what remedy is appropriate, the court must emphasize two points. First, because the court has found that the media policy, as amended by General Order 02–01, is unconstitutional, there is no need to make detailed findings with respect to the prior version of the media policy. For all intents and purposes, the prior version suffers from the same constitutional infirmities. (*Compare* Pl.Ex. 90; § 8.1.1c(3)(b) (stating that the media policy restrictions apply to "[a] trooper representing himself as a member of this department") *with* Def. Ex. G, § 8.1.1c(3)(b) (stating that the media policy restrictions

apply to "[a] trooper identifying himself as a member of this department")). Second, the court does not make any findings with respect to the confidentiality provisions of the CSP media policy. (*See* Def. Ex. G, § 8.1.1c(3)(d) (defining "confidential information"); § 14.2b(29) (proscribing the release of "confidential information")). Lauretano repeatedly testified that he did not wish to reveal information meeting the CSP definition of "confidential information," either in the past or future, and he concedes in his post-hearing submissions that he does not challenge the CSP confidentiality provisions. Therefore, nothing in this memorandum of decision or accompanying orders should be construed as adjudicating the propriety of the CSP confidentiality provisions.

### d. Remedy

■ Having found that the restrictions set forth in the policy are unconstitutional and unjustified, the court must decide on an appropriate remedy. "It goes without saying that an injunction is an equitable remedy. It is not a remedy which issues as of course...." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (citations and internal quotation marks omitted). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Id.* at 312, 102 S.Ct. 1798. In a proper case where the plaintiff succeeds on the merits of his claim, alleges irreparable injury, and demonstrates that a legal remedy would be inadequate, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of an injunction." *Id.* "In exercising their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." *Id.*

■ Here, Lauretano alleges irreparable injury, and the balance of hardships tips in his favor. As indicated herein, the CSP media policy is an unconstitutional prior restraint on employee speech, including Lauretano's speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). When juxtaposed to Lauretano's injury, any inconvenience to the CSP is ancillary to curing the unconstitutional defect in its media policy is minimal, especially given the court's ability to fashion a remedy that goes no further than needed to vindicate Lauretano's rights. Therefore, a declaratory judgment shall issue as follows:

> To the extent the media policy of the Connecticut State Police, as set forth in Chapters 8 and 14 of the Fourth Edition of the Administration and Operations Manual as amended by General Order 02–01, (1) requires an employee to obtain prior clearance to speak, not in an official capacity on behalf of the Connecticut State Police or Department of Public Safety regarding matters not defined as "confidential information" under Section 8.1.1c(3)(d), about matters of public concern from a superior officer or the Public Information Officer; or (2) altogether prohibits speaking about a matter of public concern, not in an official capacity on behalf of the Connecticut State Police or Department of Public Safety regarding matters not defined as "confidential information" under Section 8.1.1c(3)(d); the media policy violates the First Amendment to the United States Constitution.

An injunction prohibiting the defendants from enforcing the media policy in a man-

ner inconsistent with this declaration shall issue forthwith.

### B. MOTION FOR A PRELIMINARY INJUNCTION

In addition to his challenge to the CSP media policy, Lauretano claims that certain orders given to him by Lt. Benjamin Pagoni, Lt. Edmund Brunt, and Col. Barry violated the First Amendment. He seeks a preliminary injunction enjoining enforcement of these orders.

#### 1. Standard

"In order to justify the award of a preliminary injunction, the moving party must establish two elements. First, the party must demonstrate that it will suffer irreparable harm in the absence of the requested relief." *Latino Officers Ass'n v. Safir,* 170 F.3d 167, 171 (2d Cir.1999). Second, "[w]here, as here, the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party can demonstrate, in addition to irreparable harm, a likelihood of success on the merits." *Id.*

■ Regarding the first component of the standard, "[t]o establish irreparable harm, [a] plaintiff[ ] must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.' … The injury must be one requiring a remedy of more than mere money damages." *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) (quoting *Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152, 155 (E.D.N.Y.1986)). With respect to the second component of the standard, the court applies the *Pickering* test, without the modifications set forth in *NTEU,* to determine whether Lauretano is likely to succeed on the merits of his claim.

#### 2. Facts

The court adopts the factual findings previously set forth herein without prejudice to being established before the ultimate trier of fact. The following facts are reiterated for emphasis.

During the month of January, 1998, Pagoni told Lauretano "not to speak to the press." (Tr. 61:9–10). Specifically, Lauretano stated that Pagoni "called me into his office and told me that he couldn't—he couldn't save my ass if I spoke to the press." (Tr. 125:12–14). Further, Pagoni stated that "[i]f you speak to the press, they're going to find something and they're going to come after you." (Tr. 126:20–21). Brunt and IA Sergeant Robert Corona interviewed Lauretano on August 27, 1998. Brunt stated that he was interviewing Lauretano as "a witness in an internal affairs investigation." (Pl.Ex. 102 at 1). At the conclusion of the interview, Brunt stated the following to Lauretano: "you are ordered not [to] discuss any portion of the investigation except with legal counsel or union representative without prior approval of Labor Relations as requested through your Commanding Officer." (Pl.Ex. 102 at 33).

During a January 28, 1999 meeting, Barry and Lauretano's representative discussed the possibility of Lauretano accepting a lesser form of discipline in exchange for Lauretano's agreement not to contest the discipline. During breaks in the official meeting, Barry spoke with Lauretano's representative while Lauretano stood nearby. Barry complained about the ongoing media publicity, indicating that the CSP was very unhappy about it. Barry commented that he wanted media attention to stop and that Lauretano was not talk to the press. Lauretano overheard this conversation whereupon his attorney turned to him and communicated Barry's instruction 'to the effect that there better

not be any statements to the media by Lauretano regarding this matter.

At the hearing on this matter, Barry stated the following on cross-examination:

Q. Are you aware of any oral directive in effect currently that would prohibit Mr. Lauretano from speaking in defense of his personal honor?

A. No, I'm not, counsel.

(Tr. at 965:13–16).

### 3. Discussion

 Lauretano has met his burden of satisfying both components of the test for entitlement to preliminary injunctive relief. First, as previously discussed, Lauretano has suffered irreparable harm because his right to speak under the First Amendment has been chilled. Second, considering the record before this court, Lauretano is likely to succeed on the merits of his claim. The court has found that Lauretano's proposed speech relates to matters of public concern. Lauretano also testified that three different supervisors ordered him not to speak to the press. Although the circumstances of Barry's directive are not as clear as Brunt's, which was transcribed, Barry could not specifically recollect his words on the matter. The CSP has offered no clarification or justification for the orders under *Pickering,* and Barry's statement regarding the existence of any oral directives directed at Lauretano's speech was expressly limited to speech "in defense of [Lauretano's] personal honor." The *Pickering* balancing test therefore favors Lauretano, and he is entitled to preliminary injunctive relief from the unconstitutional directives. A preliminary injunction prohibiting the defendants from enforcing the oral directives discussed herein in a manner inconsistent with the First Amendment shall issue forthwith.

### C. MOTION FOR SUMMARY JUDGMENT

Defendants have filed a motion for summary judgment on all counts of Lauretano's complaint. They raise several arguments, including the defense of qualified immunity.

### 1. Standard

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if, after discovery, the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *American Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## 2. Discussion

Several arguments raised in defendants' motion have effectively been rejected through the court's resolution of the other pending motions. First, the court has found that Lauretano's proposed speech relates to matters of public concern. Therefore, Lauretano can potentially prove that defendants retaliated against him for engaging in protected activity. Second, Bardelli, Brunt, and Barry argue that they never acted to chill Lauretano's right to speak. The record reveals, however, that each defendant was personally involved in the events giving rise to this litigation. Specifically, Bardelli was the complainant who initiated the IA investigation into Lauretano's conduct, Brunt was the investigating officer who ordered, on audio tape, Lauretano not to discuss the investigation, and Barry himself disciplined Lauretano.

Defendants' assertion of qualified immunity, however, cannot be rejected at this time. Defendants argue that, to the extent their policy and directives prohibited Lauretano from speaking during the pendency of an investigation, the CSP's interest in maintaining the confidentiality of a pending investigation justifies any restrictions on speech. At the injunction hearing, Lauretano expressly disclaimed any desire to reveal confidential information in the future. Further, there is no dispute that the investigations at issue in this case have long since been closed. Therefore, the court did not consider the propriety of prohibiting the disclosure of confidential information . when it applied the *Pickering/NTEU* balancing test in considering Lauretano's request for injunctive relief. As such, the issue raised in the CSP's motion for summary judgment, regarding the justification for restricting Lauretano's speech in the past, has not yet been addressed by the court.

Defendants' motion for summary judgment is **DENIED without prejudice** with respect to their defense of qualified immunity for their written policies and oral directives during the pendency of open investigations. Defendants' motion was filed prior to the start of the hearing in this matter, and without the benefit of a decision from the court on the other pending motions. Defendants may therefore re-file their motion for summary judgment, using the record compiled to date and any other necessary materials on of before **November 19, 2004.**

## IV.

In light of the foregoing, the court orders the following:

1. To the extent plaintiff's motion for a preliminary injunction (dkt.# 53) seeks relief from an unconstitutional written policy, plaintiff's motion is converted into a motion for a permanent injunction. *See* Fed. R.Civ.P. 65(a)(2). Plaintiff's motion for a permanent injunction is **GRANTED.** A declaratory judgment shall issue forthwith stating the following:

To the extent the media policy of the Connecticut State Police, as set forth in Chapters 8 and 14 of the Fourth Edition of the Administration and Operations Manual as amended by General Order 02–01, (1) requires an employee to obtain prior clearance to speak, not in an official capacity on behalf of the Connecticut State Police or Department of Public Safety regarding matters not defined as "confidential information" under Section 8.1.1c(3)(d), about matters of public concern from a superior officer or the Public Information Officer; or (2) altogether prohibits speaking about a matter of public concern, not in an official capacity on behalf of the Connecticut State Police or Department of Public Safety regarding matters not defined as

"confidential information" under Section 8.1.1c(3)(d); the media policy violates the First Amendment to the United States Constitution.

An injunction prohibiting the defendants from enforcing the media policy in a manner inconsistent with this declaration shall issue forthwith.

2. In all other respects, plaintiff's motion for a preliminary injunction (dkt.# 53) is **GRANTED**. A preliminary injunction prohibiting the defendants from enforcing the oral directives discussed herein in a manner inconsistent with the First Amendment shall issue forthwith.

3. Defendants' motion for summary judgment (dkt.# 60) is **DENIED without prejudice** with respect to defendants' defense of qualified immunity for their written policies and oral directives during the pendency of open investigations. Defendants may re-file their motion on or before **November 19, 2004.** In all other respects, defendants' motion for summary judgment (dkt.# 60) is **DENIED**.