FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MATT MOONIN; DONN YARNALL; ERIK LEE, *Plaintiffs-Appellees*, v. KEVIN TICE, *Defendant-Appellant*, and LUIS ZAPATA; STATE OF NEVADA DEPARTMENT OF PUBLIC SAFETY, HIGHWAY PATROL DIVISION (NHP), *Defendants*. | No. 15-16571 D.C. No. 3:12-cv-00353-LRH-VPC OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted December 13, 2016
San Francisco, California

Filed August 22, 2017

Before:  Marsha S. Berzon and Mary H. Murguia, Circuit
Judges, and Frederic Block,[*] District Judge.

Opinion by Judge Berzon

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's order denying
qualified immunity to defendant Nevada Highway Patrol
Major Kevin Tice and granting partial summary judgment to
appellant, a Nevada Highway Patrol officer, in an action
brought pursuant to 42 U.S.C. § 1983 asserting that a Nevada
Highway Patrol policy, announced in an email sent by
defendant Tice, violated the First Amendment.

This action arose from a dispute regarding the
management of the Nevada Highway Patrol canine drug
detection unit.  Plaintiffs alleged that certain Nevada
Highway Patrol officers sought to undermine the
effectiveness of the K9 program, and that the policy
announced by Tice, prohibiting officers from discussing the
program with any non-departmental entity or person, was
designed to prevent officers from making the problems in the
K9 program known to the public.

---

[*] The Honorable Frederic Block, United States Senior District Judge
for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel held that sweeping policy imposed by Tice's email violated the First Amendment. The policy covered speech undertaken outside the officers' official duties and on matters of public concern. The panel held that Tice had failed to show any past disruptions sufficient to justify the expansive policy, nor did he demonstrate that any harms anticipated were real, not merely conjectural. The panel further held that it was clearly established in 2011, when Tice sent the email, that such a broad restriction on employee speech could not survive First Amendment scrutiny. Accordingly, Tice was not entitled to qualified immunity.

The panel affirmed the district court's grant of partial summary judgment to appellant on the First Amendment claim after concluding that the relevant facts were not in dispute and the legal issues were identical to those raised in the qualified immunity analysis.

## COUNSEL

Joseph F. Tartakovsky (argued), Deputy Solicitor General; Brandon R. Price, Deputy Attorney General; Cameron P. Vandenberg, Supervising Senior Deputy Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada, for Defendant-Appellant.

Kenneth J. McKenna (argued), Reno, Nevada, for Plaintiffs-Appellees.

## OPINION

BERZON, Circuit Judge:

We address a question arising out of a dispute regarding the management of the Nevada Highway Patrol ("NHP") canine drug interdiction program ("K9 program")—whether a policy announced in an email sent by defendant-appellant Major Kevin Tice to NHP K9 program officers, including plaintiff-appellee Matt Moonin, violated the First Amendment by imposing an impermissible "prior restraint" on government employee speech.[1] We hold that the sweeping policy imposed by Tice's email violated the troopers' clearly established First Amendment rights. Accordingly, we affirm the district court's denial of qualified immunity.

---

[1] Moonin calls the prospective restriction at issue here a "prior restraint," a phrase that conjures up a long line of cases in which we have held that such restraints are almost never permissible. Because Moonin's claim concerns a policy restricting employee speech, it is analytically distinct from claims involving archetypical prior restraints, like government licensing requirements affecting only citizen speech or judicial orders forbidding certain speech by private parties. *See, e.g.*, *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Near v. Minnesota*, 283 U.S. 697, 713, 720–23 (1931). Acknowledging that different interests are at stake here than in these cases, however, we sometimes use the shorthand "prior restraint" because it distinguishes Moonin's claim from the retaliation claims that more commonly raise questions regarding the scope of public employees' First Amendment rights, and because cases considering similar challenges have done so. *See, e.g.*, *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 926 (9th Cir. 2009); *Wolfe v. Barnhart*, 446 F.3d 1096, 1105 (10th Cir. 2006).

# I.

Moonin had been a trooper in the NHP K9 program. He alleges in his complaint that certain NHP officers sought to undermine the effectiveness of the K9 program, and that the policy announced by Tice was designed to prevent police officers involved in the program from making the problems in the K9 program known to the public.[2] The operative amended complaint asserted ten claims for relief pursuant to 42 U.S.C. §§ 1983 and 1985, including the First Amendment "prior restraint" claim at issue here, and named as defendants several officers and state and municipal entities.

The question before us turns on the constitutionality under the First Amendment of a policy imposed in a February 24, 2011 email sent by Tice to southern command K9 officers, including Moonin. The email at issue, sent shortly after the K9 program was reorganized, reads:

> Good afternoon,
>
> As we reengage in K9 and interdiction program oversight at the regional command level, it is important to ensure appropriate flow of communication. It is critical that we identify and resolve issues and inconsistencies that have developed since the current program's inception.

---

[2] There were two other plaintiffs, Donn Yarnall, the architect of the K9 program, who died while the district court litigation was pending, and former K9 trooper Erik Lee. Yarnall and Lee's claims are not at issue in this appeal. We refer to Moonin throughout this opinion as if he were the sole plaintiff.

Effective immediately, except for allied [law enforcement] agencies and [High Intensity Drug Trafficking Area] representatives, there will be NO direct contact between K9 handlers, or line employees[,] with ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics therein.  All communication with ANY non-departmental and non-law enforcement entity or persons regarding the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics relating to these programs WILL be expressly forwarded for approval to your chain-of-command.  Communication will be accomplished by the appropriate manager/commander if deemed appropriate. Any violation of this edict will be considered insubordination and will be dealt with appropriately.

Lieutenants Haycox, Smith and Acting Lieutenant Lee:  Please document your discussion and understanding of this direction with Troopers Matt Moonin [and other named employees] immediately.  In addition, please have necessary discussions with appropriate Sergeants.

Moonin contends that no follow-up meeting occurred; Tice disputes that.  The parties agree that at the time Tice sent

the email, the K9 officers, including Moonin, were subject to pre-existing NHP confidentiality policies not contested here.

Tice's email was sparked by concerns arising from, in the words of one of Tice's superiors, "questions coming from the legislature . . . [and from] governor's offices and from different sources . . . [with] incomplete understandings of what's going on." Tice later explained that the policy's intent "was to forbid direct contact with 'Friends for K9' representatives by the K9 and interdiction employees." Tice described Friends for K9 as a private organization that was "intentionally meddling into how the unit was run." According to Tice, "[s]evering contact with members of Friends for K9 was appropriate to eliminate their inappropriate influence and access."

The plaintiffs' First Amendment "prior restraint" claim concerning this email survived the district court's rulings on defendants' motions to dismiss. The plaintiffs moved for partial summary judgment on the "prior restraint" issue; the defendants shortly thereafter cross-moved for summary judgment on all remaining claims.

The district court granted in part and denied in part each party's summary judgment motion. After concluding that Moonin had standing to bring the First Amendment claim, the district court determined that "Tice's email was not a lawful prior restraint" and that Tice was not entitled to qualified immunity because "a reasonable supervisor would have known that such a mandate was an unconstitutional intrusion into Plaintiffs' established First Amendment rights." Finding no disputed issue of material fact that would preclude summary judgment with respect to this issue, the court granted Moonin's motion for partial summary judgment on

the First Amendment claim and denied Tice's cross-motion in relevant part. Tice appealed.

Although some issues remain to be determined by the district court,[3] we have jurisdiction to review a district court's denial of qualified immunity to a government official. *See Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016). We review de novo whether, viewing the facts in the light most favorable to Moonin, Tice is entitled to qualified immunity as a matter of law. *Id.* We also have jurisdiction over the portion of the district court's order granting Moonin partial summary judgment on the same claim, because that ruling rested on the same factual and legal issues as the district court's denial of qualified immunity to Tice and "finally and conclusively determined all liability issues against" Tice. *See Mueller v. Auker*, 576 F.3d 979, 989–90 (9th Cir. 2009). In reviewing the district court's order granting partial summary judgment to Moonin, we view the facts in the light most favorable to Tice. *See id.* at 991.[4]

---

[3] The district court has not yet ruled on Lee's trespass claim against a different defendant, the amount of Moonin's damages on his First Amendment claim, or Moonin's attorney fee motion on that claim.

[4] Several months after Tice's email, Moonin resigned from the K9 program, although (as of 2015) he remained employed as a trooper with NHP. Even if we assume that Moonin's resignation rendered moot his claim for injunctive relief, the controversy remains live because he also sought damages. *See Powell v. McCormack*, 395 U.S. 486, 497–500 (1969); *Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) (permitting a challenge to an employee pre-clearance directive to proceed, even though the plaintiffs were no longer subject to the challenged policy, because the plaintiffs sought damages).

Tice also points out that Moonin's complaint suggests he actually engaged in speech Moonin claims is proscribed, yet was not charged with

## II.

Resolution of this appeal turns, ultimately, on whether Tice is entitled to qualified immunity. We must grant Tice qualified immunity unless Moonin can show that Tice "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation omitted). We first consider whether Tice's email imposed an unconstitutional "prior restraint" on the K9 troopers' speech. We then address whether any rights Tice violated were clearly established at the time of his alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

### A. Constitutional Violation

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014). Moreover, "[t]here is considerable value . . . in encouraging, rather than inhibiting, speech by public employees," because "government employees are often in the best position to know what ails the agencies for which they work." *Id.* at 2377 (brackets, internal quotation marks, and citation omitted). At the same time, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

---

insubordination. Moonin may challenge Tice's policy as a "prior restraint" regardless of whether he has been punished for violating it. *See United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 461, 465 (1995); *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 382 (7th Cir. 2009).

Accordingly, government employees may be subject to some restraints on their speech "that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam).

A two-step analysis derived from the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968), guides our analysis of restrictions on public employee speech. We first ask whether the restriction at issue impacts a government employee's speech "as a citizen on a matter of public concern." *See Garcetti*, 547 U.S. at 418. This initial inquiry removes from First Amendment scrutiny policies affecting only speech uttered pursuant to public employees' official duties. *See id.* at 421. If the challenged speech restriction at issue reaches expression communicated in a government employee's capacity "as a citizen" and includes discussion of "matter[s] of public concern," "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public," as by disciplining or discharging him on the basis of speech. *Id.* at 418. "Under some factual circumstances, . . . the *Pickering* balancing test can favor protected speech even where the speech violates the employer's written policy requiring speech to occur through specified channels." *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009).

Although the *Pickering* framework is most often applied in the retaliation context, a similar analysis is used when assessing prospective restrictions on government employee speech. *See United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 465–68 (1995); *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 926–27 (9th Cir. 2009). Where a "wholesale deterrent to a broad category of expression"

rather than "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities" is at issue, *NTEU*, 513 U.S. at 467, the Court weighs the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's "'necessary impact on the actual operation' of the Government," *id.* at 468 (quoting *Pickering*, 391 U.S. at 571). "[U]nlike an adverse action taken in response to actual speech," a prospective restriction "chills potential speech before it happens." *Id.* The government therefore must shoulder a heavier burden when it seeks to justify an ex ante speech restriction as opposed to "an isolated disciplinary action." *Id.*

### 1.  Speech as a Citizen on a Matter of Public Concern

The first prong of the employee speech analysis involves two inquiries: whether the restriction reaches only speech within the scope of a public employee's official duties, and whether it impacts speech on matters of public concern. *See Garcetti*, 547 U.S. at 423–24. In assessing a prior restraint, we focus on the text of the policy to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern. *See, e.g.*, *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009); *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977).**[5]**

---

**[5]** Tice maintains that he never intended the policy to reach as broadly as Moonin claims. Tice's intent does not define the scope of the policy. Although intent is relevant in the retaliation context, *see, e.g.*, *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418–19 (2016), our focus in the prospective restraint context is on the chilling effect of the employer's

### a.   Speech as a Citizen

Although "[t]he First Amendment protects some expressions related to [a] speaker's job[,] . . . when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Accordingly, if Tice's policy applies only to speech made pursuant to troopers' official duties, our analysis is at an end. "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. As the Supreme Court has emphasized, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id*.

Even if some speech implicated by Tice's email edict might fall within the troopers' official duties, much of the potentially affected speech does not. Tice's policy, drafted

---

policy on employee speech, *see, e.g.*, *NTEU*, 513 U.S. at 468. That chilling effect is determined by the language of the policy—what an employee reading the policy would think the policy requires—not what Tice subjectively intended the email to say. *See Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) ("If the plain language of the directives unconstitutionally restricts speech, [] good intentions cannot vitiate that constitutional defect.").

We note that even if Tice's position in this litigation effectively has retracted or placed a narrowing construction on the policy going forward, we must still consider the policy as written in light of Moonin's claim for damages. *See Wernsing*, 423 F.3d at 745.

very broadly, could reasonably be understood to forbid, on penalty of employment discipline, speech made by K9 troopers in their capacities as citizens.

Tice's email permits "NO direct contact between K9 handlers[] or line employees with ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics therein." On a straightforward reading of this sweeping language, it is not confined to "official agency business," *compare Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 383, nor to information that would harm pending investigations or expose sources and methods, *compare Baumann v. District of Columbia*, 795 F.3d 209, 217 (D.C. Cir. 2015) (upholding a policy prohibiting disclosure of "confidential information that may jeopardize the successful conclusion of an investigation").

The policy as enunciated encompasses employees' opinions about the program. It also reaches legitimate "whistleblower" complaints about the program. And, although the policy affects only speech relating to the K9 or drug interdiction programs, we may not assume that the troopers speak as employees rather than citizens on every occasion in which they discuss information learned or opinions developed while on the job. *See Lane*, 134 S. Ct. at 2379. "[S]peech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.* Absent any qualification regarding what types of information or opinions regarding the K9 program are subject to the policy, we cannot

say that Tice's edict affects only speech made pursuant to the affected troopers' official duties.**⁶**

Further, the policy included in Tice's email seemingly applies not only to speech intended for the media but also to speech directed to community groups, to city and state legislators, to state and federal officials, and even to family members and friends. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) (en banc) (stating that communication "with individuals or entities outside of [an employee's] chain of command . . . [is] unlikely" to be pursuant to the employee's official duties). Indeed, curtailing contact with a particular community group was Tice's stated intention in sending the email. That Tice's email specifically exempts speech to allied law-enforcement agencies and High Intensity Drug Trafficking Area program representatives from the prohibition on direct contact suggests that, to the extent the policy is targeted at all, it is targeted at speech *not* made pursuant to the affected troopers' official duties.

Tice contends that, as part of their official duties, troopers are required to report misconduct, and therefore, to the extent the challenged policy covered speech addressing misconduct

---

**⁶** Moonin has not challenged NHP's pre-existing confidentiality and pre-clearance policies, and we therefore have no occasion to opine on their constitutionality. We do note that these confidentiality policies appear to be considerably more narrowly focused than Tice's pronouncement. They concern "Division information" and "official Department business."

Tice asserts that he intended that his email simply reiterate these existing confidentiality policies, but his email makes no mention of them and is much broader, referring to "all communication" regarding the K9 program rather than "Division information" or "official Department business."

within the department, such speech would have fallen within Moonin's official duties. *See Hagen v. City of Eugene*, 736 F.3d 1251, 1258–59 (9th Cir. 2013) (holding that a K9 officer's reporting of work-related safety issues to his supervisors did not constitute speech as a private citizen). It is true that Department of Public Safety policy requires employees to report "misconduct . . . where such activities may result in criminal prosecution or discipline under [Department of Public Safety] policy." Troopers are required to report misconduct "to their immediate supervisor," or, if the incident is sufficiently serious, to the Chief of NHP.

But, even granting that troopers are required as part of their jobs to report some kinds of misconduct internally, Tice's email forbids speech about many topics *aside* from misconduct—disagreements about the best K9 training protocols, for example. Under Tice's policy, troopers may not convey their opinions about *any* aspect of the K9 or drug interdiction programs to legislators or community groups. The policy thus covers speech outside the troopers' official duties, whether or not some speech within those duties is also covered.

### b. Matter of Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S. Ct. at 2380 (internal quotation marks and citation omitted). Whether speech addresses a matter of public concern "turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138,

147–48 (1983)).  Here, again, we consider all speech to which the challenged policy applies.

We have little difficulty concluding that the policy announced in Tice's email reaches speech on matters of public concern.  The policy is not limited to "direct or indirect logistics" relating to the K9 program, which Tice identifies in his email as a subset of all speech affected by the policy.  Nor is it limited to speech concerning internal personnel disputes.  *See Gibson*, 561 F.3d at 925.

Moonin contends his speech would have included commentary about "NHP's misuse of funds, promoting and condoning of unconstitutional searches, and sabotage of the K-9 Program."  *Cf. NTEU*, 513 U.S. at 461–62, 466 (considering employees' past and intended speech in assessing the First Amendment consequences of a statute affecting employee speech).  Tice's email encompasses such proposed speech.  Speech about "inefficiency in managing and operating government entities is [speech about] a matter of inherent public concern." *Moran v. Washington*, 147 F.3d 839, 849 (9th Cir. 1998) (brackets and citation omitted); *see also Robinson*, 566 F.3d at 822 ("As a matter of law, the competency of the police force is surely a matter of great public concern." (internal quotation marks and citations omitted)).  Hence, at least some subset of "[a]ll communication . . . regarding the Nevada Highway Patrol K9 program or interdiction program" implicates matters of public concern.

Moreover, Tice's policy encompasses troopers' informed opinions about the trajectory of the K9 program.  In *Pickering*, the Supreme Court concluded that, even if based on false information, a teacher's letter to a newspaper

criticizing the school board's allocation of funds and its communication with taxpayers could not serve as the basis for the teacher's dismissal. 391 U.S. at 570–73. Just as the contents of the teacher's letter to the newspaper in *Pickering* were a matter of public concern, "a difference of opinion . . . as to the preferable manner of operating" the K9 program "clearly concerns an issue of general public interest." *See id.* at 569–71. That disputes about management of the K9 program garnered media attention reinforces the conclusion that the policy impacted speech of public interest.

The troopers silenced by Tice's policy, like the teacher in *Pickering*, are "members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of [their government employer] should be spent." *Id.* at 572; *see also Lane*, 134 S. Ct. at 2379–80. The troopers' freedom to offer their informed opinions about the direction of the K9 program on their own time, as concerned citizens, is a prerogative that the First Amendment protects but that Tice's edict forbids.

## 2. *Pickering/NTEU* Balancing

Because Tice's policy reaches speech beyond that undertaken pursuant to the troopers' official duties and also encompasses speech on matters of public concern, we next ask whether Tice "had an adequate justification" for implementing the policy. *See Garcetti*, 547 U.S. at 418. "[A] government entity has broader discretion to restrict speech when it acts in its employer, but the restrictions it imposes must be directed at speech that has some potential to affect its operations." *Id.* at 411.

We must balance "the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane*, 134 S. Ct. at 2377 (brackets omitted) (quoting *Pickering*, 391 U.S. at 568). In balancing the interests on each side, we consider not only the employees' interest in speaking but also "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419; *see also NTEU*, 513 U.S. at 468.

We note at the outset that "the government's burden when seeking to justify a broad deterrent on speech that affects an entire group of its employees is greater than when it is defending an individual disciplinary decision." *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210–11 (9th Cir. 1996) (citing *NTEU*, 513 U.S. at 468); *see also id.* at 1211 ("[T]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." (quoting *NTEU*, 513 U.S. at 468 (internal quotation marks omitted))). In particular, "when the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it . . . must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (alterations and citation omitted); *see also Gibson*, 561 F.3d at 928 (upholding a pre-clearance policy where there was "a close and rational relationship between the policy and legitimate governmental interests").

Tice asserts three justifications for the policy announced in his email. The first concerns "protecting sensitive law enforcement information related to drug interdiction." Tice contends that permitting "law enforcement officers like Moonin . . . to discuss specifics about the logistics of the K9 and drug interdiction programs" would "compromis[e] the safety of officers and the general public" as well as "confidential criminal investigations and agency operations." The second interest consists of "controlling the Department's official communications about the K9 program." The third concerns "ensuring effective operation of the agency without disruption" by non-law-enforcement groups. Regarding this third category, Tice expresses concerns about "private interest groups hav[ing] the ability to shape and dictate law enforcement policy, goals, objectives and missions to the Nevada Department of Public Safety," noting a "potential for disruption in operations, unethical practices, and favored treatment towards these special interest groups."

NHP undoubtedly has a legitimate interest in keeping confidential much information about the K9 program. Releasing details about specific enforcement efforts or ongoing investigations could threaten the success of those endeavors. *See, e.g.*, *Baumann*, 795 F.3d at 216 ("It cannot be gainsaid that the [police department] has a weighty interest in preserving confidential information that, if released publicly, could jeopardize the successful conclusion of a criminal investigation."); *Swartzwelder v. McNeilly*, 297 F.3d 228, 239 (3d Cir. 2002) (acknowledging the importance of preventing disclosure of confidential police department information). Likewise, managing the content of the department's official communications to the public is a legitimate interest. *See Swartzwelder*, 297 F.3d at 239–40 ("[P]revent[ing] public confusion regarding the City's official

policies and practices . . . is a legitimate and substantial objective."). The likelihood of public confusion is diminished somewhat in this case by the fact that Tice's directive was aimed at rank-and-file troopers, not the sort of high-level, policy-making employees whom the public would be likely to assume speak for the department. *See Moran*, 147 F.3d at 850 ("[T]he State's interest in avoiding disruption is enhanced when the employee asserting her right to speak serves in a 'confidential, policymaking, or public contact role . . . .'" (quoting *Rankin v. McPherson*, 483 U.S. 378, 390–91 (1987))).

We are considerably more skeptical of the third asserted justification, which the record suggests was the primary impetus for Tice's email. Tice and his supervisor refer to disruption resulting from communication between K9 officers and outside groups, but specific information about this past or possible future disruption is scarce in the record. For instance, one of Tice's supervisors testified that he instructed Tice to send the email "because we had . . . issues with questions coming from the legislature," governor's office, and others with "incomplete understandings of" what was happening in the department. Another officer described, as the motivation for the policy, concerns about "divisional information, department information, related to our decision and decision-making and how we were trying to manage and provide oversight to the canine program . . . being shared outside of the department." Tice, in his deposition, stated that he received instructions to send out the email because "the influence that was continually being applied to governor's staff by outside department individuals . . . [was] no longer welcome" and K9 program members' continued communication with non-law-enforcement entities was creating "disruption."

The only more specific account of the incidents motivating the new policy was provided by Tice in his affidavit. In that document, Tice stated that the purpose of the policy "was to forbid direct contact with 'Friends for K9' representatives," because members of the group "were intentionally meddling into how the unit was run, who would be in the unit, day-to-day assignments of the unit members, and how authority over the unit would be structured[,] which severely limited oversight and effectiveness of the Division." The record does not make clear how this outside group actually accomplished the "meddling" he describes.

Although it could be true that police departments would operate more efficiently absent inquiry into their practices by the public and the legislature, efficiency grounded in the avoidance of accountability is not, in a democracy, a supervening value. Avoiding accountability by reason of persuasive speech to other governmental officials and the public is not an interest that can justify curtailing officers' speech as citizens on matters of public concern. There is no indication in the record that the non-law-enforcement entities that concerned Tice and his superiors had the "ability to shape and dictate law enforcement policy, goals, objectives and missions" by any means other than successful persuasion of policy-making officials. Without any specific evidence regarding direct, improper interference in specific investigations, vague allegations about the "potential for disruption in operations, unethical practices, and favored treatment towards . . . special interest groups" are insufficient to legitimize an interest in avoiding outside "meddling."

In any event, even crediting the departmental interests as enunciated, they cannot, individually or taken together, support the sweeping policy announced in Tice's email. The

message prohibits troopers from engaging in "*all* communication with ANY non-departmental and non-law enforcement entity or persons regarding the Nevada Highway Patrol K9 program or interdiction program, or direct and indirect logistics relating to these programs" (italics added). This expansive policy does not bear a "close and rational relationship" to the department's legitimate interests. *See Gibson*, 561 F.3d at 928.

Tice's policy makes no distinction between speech about the K9 program that reasonably could be expected to disrupt NHP's operations and speech that plainly would not, or that would do so only inasmuch as it engendered legitimate public debate about the management of the program.[7] The prohibition it imposes is not tailored to prevent the release of factual information or official records that would jeopardize ongoing or future investigations. *Compare Baumann*, 795 F.3d at 212, 217; *Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 383. Nor is it targeted only at messages conveyed in an officer's official capacity, as would be more likely to muddle the official position of the department. Instead, Tice's directive sweeps broadly to cover "all communication" about the program with those outside law enforcement.

Not only is Tice's policy broad in terms of subject matter; it imposes a severe limitation directly on the troopers' speech.

---

[7] Tice argues that existing whistleblower protection laws made clear that his email was not intended to reach legitimate whistleblowing. The plain language of Tice's email suggests otherwise, threatening those who do not channel their concerns through the chain of command with a declaration of insubordination and attendant punishment. That some other law or policy might ultimately vindicate a whistleblower's position does not mean that the specific threat of an insubordination determination would not chill some speech in a manner relevant to our analysis here.

The email commands that K9 officers not communicate with non-law-enforcement personnel about the K9 program under *any* circumstances, with or without prior notice or approval. The mandate is that "[c]ommunication will be accomplished by the appropriate manager/commander if deemed appropriate," not by the K9 officer wishing to speak. Under Tice's policy, only approved messages will ever reach the public, and then only in the words of the trooper's supervisor. Such a system creates constitutional difficulties above and beyond those created by pre-clearance regimes.

Like public employer pre-clearance policies held to be unconstitutional, the policy announced in Tice's email leaves entirely at the discretion of the trooper's "manager/commander" the determination of which communications are "appropriate." *See, e.g.*, *Swartzwelder*, 297 F.3d at 238–41; *Harman v. City of New York*, 140 F.3d 111, 119–21 (2d Cir. 1998). Such unbounded discretion as to substance raises the specter of arbitrary or viewpoint-discriminatory enforcement. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988); *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (en banc) (acknowledging this concern in striking down a regulation affecting employee speech).

By going beyond a pre-clearance regime, the additional constriction as to *who* may convey an approved message sanctions additional interference with the troopers' right of free expression. The ban on direct speech, silencing the originator of even an approved message, is likely fundamentally to distort the intended message, both by leaving the precise timing and content of any message to a trooper's superiors and by misconveying the source of the message.

In sum, Tice has not shown any past disruption sufficient to justify the expansive policy announced, nor has he demonstrated that any harms anticipated "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *See NTEU*, 513 U.S. at 475 (alterations and citation omitted). We therefore hold that the prospective speech restriction imposed by Tice's email violated the First Amendment.

## B.  Clearly Established Law

We next ask whether the First Amendment right Tice violated was clearly established at the time he sent his email in 2011.   "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Broad principles ordinarily cannot constitute clearly established law. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).   Rather, "clearly established law must be 'particularized' to the facts of the case."   *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although we do "not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted) (quoting *Mullenix*, 136 S. Ct. at 308).

We first look to binding precedent to determine whether a right is clearly established. *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014).   "In the absence of binding precedent clearly establishing the constitutional right, 'we

look to whatever decisional law is available,'" including relevant decisions of other circuits, state courts, and district courts. *Id.* (quoting *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004)).

As an initial matter, it was clear in 2011 that some of the speech impacted by Tice's edict was protected by the First Amendment. As early as *Pickering*, it was clear that employees' opinions about the proper way to administer government agencies, when conveyed in that employee's capacity as a private citizen, constituted protected speech. *See Pickering*, 391 U.S. at 571–72. Controlling precedent also made clear in 2011 that it was generally unconstitutional to punish a police officer for speaking out about malfeasance or mismanagement in the department. *See Robinson*, 566 F.3d at 824–25. Tice was therefore clearly on notice that a policy precluding *all* sorts of speech by officers, to whomever communicated, about the K9 program was subject to limits imposed by the First Amendment. Moreover, it was abundantly clear in 2011 that ex ante restrictions on employee speech are more constitutionally problematic than after-the-fact decisions to punish a particular employee for his speech. *See NTEU*, 513 U.S. at 467–68; *Tucker*, 97 F.3d at 1210–11.

Without more, the marriage of these two precepts in large part resolves this case. Tice's policy was written so broadly as to promise punishment for some speech that, as of 2011, clearly received constitutional protection.

In light of the Supreme Court's emphasis on identifying clearly established law "'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (citation omitted), however, we consider in detail cases addressing analogous employer prior restraints on speech. These cases demonstrate that the

First Amendment right Tice violated was clearly established
at the time he sent his email.

Employer prior restraint cases address a spectrum of
workplace regulations falling, generally, into three categories
that raise constitutional issues of increasing severity:
(1) regimes requiring that an employer be notified of the
content of the employees' speech; (2) regimes requiring that
an employee seek supervisor pre-approval before speaking;
and (3) regimes prohibiting any and all discussion of certain
topics with the public. Tice's email imposed the last of
these—a bar on discussion of a particular subject with anyone
outside the law-enforcement community. But consideration
of the escalating constitutional concerns raised by each
category of restrictions both explains and confirms our result
today. We therefore address each in turn.

Had Tice's edict imposed only a notice regime, we well
might grant qualified immunity. There is no relevant
controlling authority forbidding a notice requirement,[8] and
persuasive cases addressing such restrictions, including in the
law-enforcement context, have sometimes allowed them to
stand. For example, in *Latino Officers Association v. Safir*,
170 F.3d 167, 168 (2d Cir. 1999), the Second Circuit declined
to enter a preliminary injunction against a New York City
Police Department policy requiring officers to notify the
department in advance of any speaking engagement and to
provide a written summary of the speech the next day. The
City previously had required officers to obtain prior written

---

[8] We emphasize that we are here considering only the clearly
established law prong of qualified immunity, not whether requiring notice
or approval of speech such as that covered by Tice's email is
constitutionally proper.

approval from the police commissioner before they could proceed with the engagement, but the City rescinded the pre-approval requirement during the course of the litigation. The court accordingly observed that, "[i]n the absence of the approval requirement, there is no opportunity for the City to suppress or delay speech expressing dissenting views." *Id.* at 172; *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1436–39, 1443 (D.C. Cir. 1996) (reading narrowly an employee pre-publication review policy to impose only a review, rather than an approval, requirement, so as to avoid the "serious constitutional issues" that would arise from an advance approval requirement). Tice's policy, in contrast, not only imposed a species of pre-approval requirement, thus allowing NHP to suppress any speech it deemed not "appropriate," but also prohibited the officers themselves from expressing even approved messages.

As *Latino Officers Association* and *Weaver* indicate, the next category of employee speech restrictions, those requiring a supervisor to approve in advance the content of the employee's speech, raises more significant constitutional problems. Many cases had held by 2011 that such regulations violate the First Amendment. Even so, were Tice's edict limited to a pre-approval requirement, the qualified immunity issue would have a different cast than the one we face.

Controlling cases suggested that employer pre-approval regimes were in some instances permissible, albeit in situations quite different from the one we consider today. For instance, in *Snepp v. United States*, 444 U.S. 507, 511–13 (1980) (per curiam), the Supreme Court enforced a CIA employment agreement requiring agents to submit for pre-publication approval any material relating to the agency, its activities, or intelligence activities in general. Over a dissent

by Justice Stevens and two of his colleagues highlighting the First Amendment concerns inherent in such a policy, *see id.* at 520 nn.9–10, 522, 526 n.17, the Court emphasized the "extremely high degree of trust" essential to the intelligence agency's work, *id.* at 510, noting that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service," *id.* at 509 n.3. In upholding the policy, the Court also credited the government's "[u]ndisputed evidence . . . that a CIA agent's violation of his obligation to submit writings about the Agency for prepublication review impairs the CIA's ability to perform its statutory duties," regardless of whether the written material includes classified information. *Id.* at 512–13; *see also Brown v. Glines*, 444 U.S. 348, 361 (1980) (upholding Air Force regulations requiring members of the service to obtain approval from their commanders before circulating petitions on Air Force bases).

In *Gibson v. Office of the Attorney General*, 561 F.3d at 927–28, the Ninth Circuit in 2009 upheld a California Department of Justice policy requiring attorneys employed by the Department to obtain prior approval before engaging in the private practice of law. We concluded that the Department had a legitimate interest in avoiding conflicts of interest and prejudice to the Department and its clients, and in ensuring that employees are devoting their full attention to their work for the Department. *Id.* at 928. Noting that the policy did not prohibit all outside practice of law and was more permissive than a similar policy upheld by the U.S. Court of Appeals for the District of Columbia, we held that there was a "close and rational relationship between the policy and legitimate governmental interests." *Id.*

In short, controlling case law as of 2011 indicated that employer pre-approval regimes tailored to address specific, legitimate government interests sometimes pass constitutional muster. At the same time, persuasive cases addressing pre-clearance regimes more closely analogous to the policy imposed by Tice strongly indicated that even a pre-clearance regime—as opposed to the outright prohibition at issue here—affecting an entire topic of discussion would run afoul of the First Amendment.

For example, in *Harman v. City of New York*, 140 F.3d at 124, the Second Circuit in 1998 held unconstitutional an agency press policy that applied to employees of New York City's child welfare and social services agencies. The policy provided that "[a]ll contacts with the media regarding any policies or activities of the Agency . . . be referred to the [] Media Relations Office before any information is conveyed by an employee or before any commitments are made by an employee to convey information." *Id.* at 116. The court, considering the policy's effect only on information of public concern and not protected from disclosure by statute, concluded that the interests of the plaintiff employees and the listening public outweighed the agencies' interests in protecting confidential information and ensuring efficient and effective operation. *Id.* at 119, 124. In particular, the court highlighted that a pre-clearance requirement could inhibit even speech that ultimately would be approved, as employees might self-censor rather than risk denial of permission to speak; allowed the agency to control the timing of the employees' speech; and, as the policy gave unbridled discretion to the agency decision-maker, presented an unacceptable risk of content or viewpoint censorship. *Id.* at 119–21.

Other decisions similarly demonstrated that, even had Tice's policy only required troopers to obtain pre-approval before speaking about the K9 program, the policy would most likely have violated the First Amendment.  For instance, in *Swartzwelder v. McNeilly*, 297 F.3d at 238–41, the Third Circuit in 2002 upheld a preliminary injunction prohibiting enforcement of a police department policy requiring employees to obtain supervisor pre-approval before testifying in court as an expert witness.  Applying *NTEU*, the Third Circuit concluded that the police officer challenging the policy was likely to succeed on the merits of his First Amendment claim.  *Id.* at 241; *see also Crue v. Aiken*, 370 F.3d 668, 674–75, 679–81 (7th Cir. 2004) (holding unconstitutional a policy requiring express authorization before any student, employee, or other individual associated with a university could communicate with a prospective student athlete, and further holding that the official who promulgated the policy was not entitled to qualified immunity). *But see Wernsing v. Thompson*, 423 F.3d 732, 748–50 (7th Cir. 2005) (concluding that, although the court had "serious doubt" about the legality of a policy requiring Office of the Inspector General staff to obtain prior approval before speaking to the secretary of the department, press, or "any external agent" about Office policies or operations, it was not clearly established in 2000 that such a directive violated the First Amendment); *Zook v. Brown*, 865 F.2d 887, 889, 892 (7th Cir. 1989) (upholding a sheriff's department regulation requiring supervisor approval before employees could identify themselves as officers "in connection with

testimonials or advertisements of any commodity or commercial enterprise").**⁹**

As we have already emphasized, Tice's edict goes much further than the restrictions considered in any of these cases. His email prohibits *all* direct contact between troopers and the public for the purpose of discussing any information or opinion relating to the K9 program. As the notice and pre-approval cases indicate and the cases that follow confirm, it was clearly established when Tice sent the email that such a broad restriction on employee speech could not survive First Amendment scrutiny.

---

**⁹** Several district court opinions have struck down public employee pre-clearance requirements directed at broad categories of speech intended for the public. *See, e.g.*, *Parow v. Kinnon*, 300 F. Supp. 2d 256, 266 (D. Mass. 2004) (holding unconstitutional a policy requiring prior approval of any public comment regarding the plans, policies, or administration of the fire department, fires, or department business); *Lauretano v. Spada*, 339 F. Supp. 2d 391, 420 (D. Conn. 2004) (applying *Harman* to invalidate a state police department media policy requiring officers to obtain prior approval before speaking to the press); *Kessler v. City of Providence*, 167 F. Supp. 2d 482, 490 (D.R.I. 2001) (holding unconstitutional police department rules that potentially prohibited "all speech even remotely related to the Police Department" to any unauthorized person unless permitted by a supervisor); *Spain v. City of Mansfield*, 915 F. Supp. 919, 923 (N.D. Ohio 1996) (holding facially unconstitutional a policy requiring firefighters to obtain prior written approval from a superior before engaging in any public communication on matters concerning the fire department rules, duties, policies, procedures, or practices); *Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182, 1194 (D.D.C. 1990) (holding unconstitutional a requirement that firefighters obtain prior written permission from the public affairs officer before giving interviews while on duty); *Micilcavage v. Connelie*, 570 F. Supp. 975, 982 (N.D.N.Y. 1983) (invalidating a regulation requiring members of the New York state police to obtain the authorization of the superintendent before delivering a public address or speech).

Controlling case law addressing flat prohibitions on employee speech is, and was in 2011, limited. But Supreme Court and Ninth Circuit precedent emphatically signaled that a policy prohibiting public discussion of matters of public concern by employees of a particular government program, without a countervailing showing of substantial workplace disruption, was much too broad to be constitutional.

*NTEU* addressed a statute banning the receipt of compensation by federal employees for making speeches or writing articles, regardless of whether the speech related to the employee's official duties. Although this restriction banned only an incentive for the creation of speech, rather than speech itself, the Supreme Court concluded that such a sweeping disincentive to speech violated the First Amendment. *See* 513 U.S. at 475–76. Applying this precedent, the Ninth Circuit later struck down a broadly worded ban on religious advocacy within a particular workplace. *See Tucker*, 97 F.3d at 1210–12, 1214; *but see Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650, 652 (9th Cir. 2006) (distinguishing *Tucker* and upholding narrower restrictions forbidding discussion of religion with clients and display of religious items in areas of a government agency office to which clients had access). The factual situations addressed in these controlling cases are not closely similar to the one we consider today—but that is likely because the bans considered in these cases were narrower and thus more debatably constitutional than the one here, which directly restricts speech and does so outside the workplace. "[N]otwithstanding the absence of direct precedent, the law may be . . . clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*

*v. Rutherford*, 272 F.3d 1272, 1285–86 (9th Cir. 2001) (citation omitted).

Because there is limited controlling precedent on point, we turn to persuasive authority. *See Jones v. Williams*, 791 F.3d 1023, 1034 (9th Cir. 2015). We conclude that persuasive cases addressing more closely analogous regulations would have made reasonable government officials quite aware, had they any doubt, that Tice's edict ran afoul of the First Amendment.

The Tenth Circuit, for example, denied qualified immunity to a school administrator who imposed on teachers a "broad ban[] on the discussion of all 'school matters' with anyone." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1185, 1187 (10th Cir. 2010). The court observed that, when read in the light most favorable to the plaintiffs, the challenged directives were "not limited to the improper discussion of . . . confidential information." *Id.* at 1185. As such, the court concluded, the directives "were certainly broad enough to potentially stifle speech of public concern." *Id.* at 1186. The administrator's "legitimate interests in ensuring the efficient functioning of the school and deterring teachers from disclosing confidential student information did not justify a ban on the discussion of all school matters." *Id.*; *see also Luethje v. Peavine Sch. Dist.*, 872 F.2d 352, 354–56 (10th Cir. 1989) (concluding, in the context of a fee application, that a "broadly worded rule" promulgated by the school board that lunchroom personnel must discuss "school problems" with the principal and not with others violated the First Amendment).

The Fifth Circuit in *Barrett v. Thomas*, 649 F.2d 1193, 1199 (5th Cir. 1981), likewise struck down regulations of a

breadth comparable to Tice's edict. The court considered a
First Amendment challenge to sheriff's office personnel
regulations prohibiting "unauthorized public statements,"
comments by employees to reporters on any topic "that is or
could be of a controversial nature," and comments by
employees to elected officials concerning sheriff's office
policy or procedure. *Id.* The Fifth Circuit held these
regulations facially overbroad, as they "explicitly forb[ade]
acts that departmental employees have a clear constitutional
right to do." *Id.*; *see also Alderman v. Phila. Hous. Auth.*,
496 F.2d 164, 174 (3d Cir. 1974) (holding that a
memorandum prohibiting employees of the Philadelphia
Housing Authority from discussing rental advisory board
politics with tenants violated the First Amendment, and
noting that "precious little in the case law supports the
imposition of a restraint on all the speech of public
employees, even concerning a particularized topic").

Several district courts and at least one state court have
reached the same conclusion regarding similar restrictions.
*See Int'l Ass'n of Firefighters Local 3233 v. Frenchtown
Charter Twp.*, 246 F. Supp. 2d 734, 736, 744 (E.D. Mich.
2003) (invalidating a fire department policy permitting only
the fire chief to release facts regarding fire department
matters, fires, or other emergencies to the news media);
*Grady v. Blair*, 529 F. Supp. 370, 371–72 (N.D. Ill. 1981)
(holding unconstitutional a fire department order prohibiting
employees, whether on or off duty, from speaking about any
subject pertaining to department activities); *Davis v. N.J.
Dep't of Law & Pub. Safety*, 327 N.J. Super. 59, 69, 90 (Law.
Div. 1999) (granting a preliminary injunction against a state
police policy requiring, among other things, that officers
"[t]reat as confidential, unless the contrary is specifically
authorized by competent Division authority, any matters or

information which pertain to the Division, its operations, investigations or internal procedures" on the ground that it constituted an unlawful prior restraint); *cf. San Bernardino Pub. Emps. Ass'n v. Stout*, 946 F. Supp. 790, 799, 801 (C.D. Cal. 1996) (stating that a policy prohibiting certain county employees from releasing to anyone not authorized to have it any information acquired while at work and prohibiting employees from speaking to the media about matters pertaining to the division "appear[ed] facially to constitute an impermissible prohibition on protected speech," but not deciding the issue).

This consistent case law certainly does not suggest that government employers may not impose any confidentiality or chain-of-command policies. In particular, the relevant case law makes clear that policies restricting speech uttered pursuant to a public employee's official duties are generally permissible. But, as prior cases make clear, such policies must be tailored to protect information the government has a legitimate interest in keeping confidential.

For example, in *Milwaukee Sheriff's Association v. Clarke*, 574 F.3d at 382, the Seventh Circuit in 2009 upheld a sheriff's department confidentiality policy providing that "all Sheriff's Office employees shall keep official agency business confidential," and "shall not impart it to anyone except those for whom it is intended, or as directed by the Sheriff or his designee, or as ordered by law." The Seventh Circuit analyzed the policy as a prior restraint on speech and concluded that it was not unconstitutional because—in contrast to the edict issued by Tice—it expressly applied only to "official agency business," and thus applied only to speech owing its existence to the officers' professional responsibilities. *Id.* at 383–84. In reaching this conclusion,

the Seventh Circuit distinguished the sheriff's department policy from one that rendered confidential all information "related to" the department's official agency business. *Id.*; *see also Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1052 (7th Cir. 2008) (concluding a school's chain-of-command policy did "not restrict any speech protected by the First Amendment" because it required employees to follow the chain of command "only on matters 'requiring administrative attention,' that is, issues that their job responsibilities require them to report to a supervisor" and did not "limit[] a staff member's right to speak in public about issues related to" the school); *Hanneman v. Breier*, 528 F.2d 750, 752, 754 (7th Cir. 1976) (stating in passing that a police department rule requiring officers to "treat as confidential the official business of the Department" was "clearly valid on its face" but holding that enforcement of the policy under the circumstances violated the First Amendment)*; cf. Wolfe*, 446 F.3d at 1108–09 (upholding a regulation prohibiting federal employees from receiving outside compensation for teaching, speaking, or writing that relates to the employee's official duties, a ban that did not directly preclude speech); *Shelton Police Union, Inc. v. Voccola*, 125 F. Supp. 2d 604, 623, 625 (D. Conn. 2001) (upholding a narrower police department policy requiring "all formal releases to the press" to be disseminated through the media relations officer and prohibiting disclosure of "any information relating to pending investigations or any information not otherwise available to the public if such information is exempt from public disclosure pursuant to the Freedom of Information Act").[10]

---

[10] Tice cites this Court's unpublished memorandum disposition in *Satter v. Washington Department of Ecology*, 462 F. App'x 685 (9th Cir. 2011), to support his argument that qualified immunity is warranted here. *Satter* concluded that an employer was entitled to qualified immunity for

In short, a "robust consensus" of prior cases made clear at the time Tice issued his edict that an employer ordinarily[11] may not prohibit its employees from all public discussion relating to a particular department or government program. *See Sheehan*, 135 S. Ct. at 1778. Tice's policy did just that, making punishable any direct communication "regarding the [NHP] K9 program or interdiction program," with no attempt to tailor the speech restrictions to NHP's legitimate interests. Accordingly, we hold that Tice is not entitled to qualified immunity.

## C. Moonin's Motion for Summary Judgment

In addition to denying Tice's motion for summary judgment on the basis of qualified immunity, the district court granted Moonin's motion for partial summary judgment on the prior restraint issue. We have already concluded that Tice is not entitled to qualified immunity. As the relevant facts are not in dispute[12] and the legal issues are identical, we affirm

---

imposing a restriction on an employee's speech "during the pendency of an investigation into her work-related conduct." *Id.* at 686–87. The time-limited and case-specific prior restraint imposed in *Satter*, *see also*, *e.g.*, *Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004), bears little resemblance to the unbounded restriction imposed by Tice here.

[11] Of course, our analysis would be different if the existence of the program itself was secret. But here, the program is public and its management is the subject of significant public discussion.

[12] The only disputed fact of any possible consequence is whether NHP Lieutenant Haycox held a meeting with the troopers after Tice sent the email. Tice was at that time Haycox's superior. So even if Haycox conveyed a directive different from the one embodied by the text of Tice's email, as he contends, it did not ameliorate the chilling effect created by Tice's email, which was sent directly to the troopers.

the district court's grant of partial summary judgment to Moonin on the prior restraint claim.

## CONCLUSION

Government employers have significant and legitimate interests in managing the speech of their employees, particularly where the employees' speech pertains to their work. And policies explaining how sensitive information ordinarily should be handled benefit both employers and employees. We make clear today, however, that a public employer generally may not subject *all* employee speech regarding a particular government program—whether fact or opinion, and whether liable to disrupt the workplace or not—to a blanket ban. A government employer's policies imposing prior restraints on their employees' speech as citizens on matters of public concern must bear a "close and rational relationship" to the employer's legitimate interests, and the broad policy Tice announced did not meet this standard. This conclusion was compelled by prior case law at the time Tice sent his missive. We therefore hold that Tice is not entitled to qualified immunity, affirm the district court's denial of his motion for summary judgment on that basis, and further affirm the district court's grant of Moonin's cross-motion.

**AFFIRMED.**